[No. S004767. Crim. No. 26407. June 18, 1992.]

THE PEOPLE, Plaintiff and Respondent, v.
STEVEN LIVADITIS, Defendant and Appellant.

COUNSEL

Fern M. Laethem, State Public Defender, under appointment by the Court of Appeal, Adrian K. Panton, Chief Assistant State Public Defender, W. Dean Freeman, Patricia L. Reber and Richard D. Marino, Deputy State Public Defenders, for Defendant and Appellant.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Carol Wendelin Pollack, Acting Assistant Attorney General, Susan Lee Frierson and John R. Gorey, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

ARABIAN, J.—On June 23, 1986, defendant took five hostages during a robbery of the Van Cleef & Arpels jewelry store on Rodeo Drive in Beverly

Hills. During the next tension-filled thirteen hours he stabbed one of the hostages to death, and fatally shot a second in the head. At the end of that time, the police were able to capture him as he tried to flee the area with the three surviving hostages. Tragically, a third hostage was accidentally killed by the police in the ensuing confusion.

In a case filed under the 1978 death penalty law, defendant pleaded guilty to the first degree murder of William Smith, Ann Heilperin, and Hugh Skinner (Pen. Code, § 187)[1]; to five counts of robbery (§ 211); to three counts of kidnapping (§ 207, subd. (a)); and to one count of second degree burglary (§ 459). He admitted special circumstance allegations of murder during the commission of robbery and burglary as to two of the murders (§ 190.2, subd. (a)(17)), and multiple murder (§ 190.2, subd. (a)(3)). He also admitted certain weapons enhancement allegations.

After a penalty trial, the jury imposed the death penalty. The trial court denied the automatic motion to modify the verdict (§ 190.4, subd. (e)), and entered a judgment of death. This appeal is automatic. (§ 1239.) We affirm.

## I. Facts

### A. *The Crime*

Van Cleef & Arpels opened for business as usual at 10 a.m. on June 23, 1986. A short time later, defendant entered carrying a briefcase, intent on robbing the store. A security guard, murder victim William Smith, and three sales clerks—murder victims Ann Heilperin and Hugh Skinner and one of the surviving hostages, Carol Lambert—were inside the main sales area. Defendant asked Heilperin to show him some watches, and the two entered the adjoining watch boutique.

A few minutes later, Heilperin screamed, and yelled, "Please don't hurt me." Defendant then forced her back into the main sales room at gunpoint. He told everybody not to move. Smith, the security guard, tried to draw his own firearm, but defendant forced him to his knees and disarmed him. Robert Taylor, the shipping clerk, heard Heilperin's scream and ran to the sales room from his office in the rear. Defendant saw Taylor, and ordered him to enter the room. Taylor, seeing defendant's revolver, complied. Everyone else in the building heard that a robbery was in progress, and escaped. The police were alerted, and quickly arrived at the scene.

A standoff ensued. The police surrounded the building. Defendant was inside with five hostages, the three sales clerks (Heilperin, Skinner and

---

[1]Further unspecified statutory references are to this code.

Lambert), the security guard (Smith), and the shipping clerk (Taylor). The crisis was not to be resolved for another 13 hours.

Defendant ordered the hostages into the watch boutique. He then ordered them to lie face down on the floor except for Lambert and Taylor. Defendant forced these two to bind the other hostages' ankles and also bind their hands behind their backs with rolls of plastic tape defendant had brought in his briefcase. When they finished, defendant ordered them to fill his briefcase with watches from the store.

Defendant started to leave the building accompanied by Taylor, but he observed the police outside and returned to the watch boutique. He appeared to be angry that the police were present. He forced Lambert to tape Taylor like the others, except in a sitting position. Next, he had her dial, 911. From that location followed the first of many telephone conversations between defendant and the police.

Defendant said his name was "John," and demanded that the police leave, that he be put on the television news, and that he be provided with a television set. He threatened to "execute these people one at a time." He described Smith as an "old, weak, fragile man." At some point after this conversation, defendant also bound Lambert with the tape.

Defendant turned his attention to Smith. He told Smith that he was too old to be a security guard and that his gun was "outdated." Smith responded, "You think you are a big man with that gun." This angered defendant. He told Smith that he talked too much, retrieved a hunting knife from his briefcase, and told the others to look away. He then stabbed Smith in the middle of the back with the knife. Blood from the wound spurted onto Taylor's face. Smith gasped for breath twice, tried to rise onto his shoulders, then slumped down. Still bound and lying face down, he bled to death in the presence of the other hostages, who were powerless to assist him. Defendant covered the body and the knife with a coat; the body remained that way until the incident was over.

Defendant told a correspondent for United Press International by telephone that he had only intended to rob the store and leave. He said he had stabbed Smith in the back because Smith did not follow orders and "kept talking." He felt "no remorse" for the stabbing; it was an "appropriate thing to do at the time." Defendant also threatened to shoot the remaining hostages if the police "storm the place," and said he might soon "have to execute somebody else" if his "demands [were] not met." He allowed some of the hostages to speak to the correspondent. He ended the conversation by telling the correspondent, "have a nice day."

At one point, defendant forced Heilperin to lie down next to Smith's body and face the wall. Since she was still taped, she had to "scoot[] on her rear" to comply. Defendant seemed angry with her because she had screamed at the outset of the robbery. He called her "Big Mouth Annie." About half an hour after defendant forced Heilperin to face the wall, during the early afternoon, he spoke with a person from Channel 5. During the conversation, defendant told the listener, "Quiet, just a minute," and "walked over, put the gun to Annie's head and pulled the trigger." Heilperin was killed instantly. Defendant resumed his telephone conversation, telling the listener that his gun had "misfired."

After he killed Heilperin, defendant's attitude changed, as if he was relieved by shooting her. He covered the body. About 45 minutes later, he allowed Skinner to tell the police that Heilperin had been killed. Around this time, defendant tied Skinner and Taylor together on two chairs to act as a "shield" in case anyone tried to enter the boutique.

By this time, Taylor thought that the hostages' only chance of surviving the ordeal was for everyone somehow to leave the building. Skinner devised a plan. Several pieces of cloth used in displays were available inside the store. Skinner suggested to defendant that they sew the pieces together into a sort of blanket, then use the blanket to cover defendant and the hostages as they left the store. The police would not be able to distinguish who was a hostage and who was the gunman, and thus could not shoot defendant. They could then safely walk to a nearby car owned by the store and drive away. Taylor had the keys to the car. Attempting to make defendant happy, Skinner also suggested that defendant take more expensive items of jewelry instead of the watches he had already taken.

Defendant agreed to the suggestions. Skinner went to another room and collected more expensive jewelry for defendant. Lambert used a ball point pen and some string from defendant's briefcase to stitch the pieces of cloth together. She started the job in the early evening; it took about three or four hours.

When the blanket was finished to defendant's satisfaction, he and the three surviving hostages practiced walking under it. The hostages would be tied together at the waist with defendant in the middle. Defendant said that when they got to the car, Lambert would drive, and defendant would be in the middle of the front seat, with Skinner to his right. Taylor was supposed to be in the middle of the back seat to act as a shield from the rear. The four practiced with the blanket for a couple of hours. Defendant was in no hurry because he wanted to wait until it got dark. During this time, defendant placed more jewelry into the briefcase.

Eventually, the time came to leave. Defendant tied the hostages together around the hands and waist, and got in the middle. Around 11:30 p.m., they walked out of the store in this formation covered by the improvised blanket, which reached to the ground. Defendant carried his briefcase and the gun. On the way out, defendant had Skinner remove some loose stones and big rings from a safe. Since defendant could not get into his briefcase, he told Skinner to place this jewelry into Skinner's pocket.

Outside, the four walked to the nearby parking lot where the car was located. Skinner and Taylor yelled that they were hostages and pleaded for no one to shoot them. Taylor could hear the "murmuring" of people in the background. Defendant threatened to kill the hostages if the police tried to stop them.

In the meantime, law enforcement personnel, including members of the Los Angeles County Sheriff's Department, had secured the area. They had decided not to allow the group to get away in a vehicle and thus "go mobile." Two deputies were armed with "flash bangs"—"diversion devic-e[s]" that go off like "large firecracker[s]" when ignited by a pin mechanism —and were instructed to throw them at the group when it reached the car. Deputy Sheriff George Johnson, a sharpshooter with the SWAT team, was stationed on the seventh level of a nearby parking structure.

The law enforcement officials had been erroneously informed that both of the male hostages were Black. (In fact, Taylor is Black, but Skinner was White.) The error was never corrected. Thus, Deputy Johnson was informed that the only White male in the group was the gunman. To compound the confusion, Skinner's appearance generally matched the sketchy description of the gunman that was available.

When the group under the blanket reached the car, the two deputies threw the flash-bangs as planned. They exploded. The blast knocked defendant, Lambert and Taylor to the ground under the blanket. Skinner was separated from the others. A moment later, Skinner pointed to the defendant and yelled, "Here he is."

Deputy Johnson was watching these events through the scope of his rifle. He saw the blast "spin" one person away from the others and onto his back. Deputy Johnson's view was briefly obscured by smoke. When the smoke cleared, he observed that the person separated from the others was a White male similar in appearance to the description of the gunman. Believing this person to be the gunman, Deputy Johnson "locked in" on him "like a heat seeking missile." He focused the cross hairs of his rifle scope on the center

of the man's chest. He heard his spotter say something like "shiny object," and heard someone else yell "gun." Then he saw the person who had been separated start to rise and point toward the group underneath the blanket. In fact, it was the hostage Skinner pointing toward defendant.

Deputy Johnson had to concentrate on the cross hairs of the scope; thus he could not look closely at the man's hands but could only perceive that he pointed toward the group under the blanket. Johnson was convinced that Skinner was the gunman, and that he was "going to start killing hostages as he stated he would." To prevent this, Deputy Johnson "terminated" the man by a single shot through the chest.

A moment later, when other officers lifted the blanket, and Deputy Johnson could see another White male (defendant), he commented, "Where did he come from?" He soon learned that he had not shot the gunman but, by mistake, one of the hostages. Skinner died of the wound.

The officers quickly rescued the surviving hostages and arrested defendant. Defendant's gun was found on the ground between two cars. It was loaded with six .357 magnum bullets and was cocked, ready to fire. Nearby were a switchblade knife and a "speedy loader," a device used to quickly reload the gun. The covered bodies of Heilperin and Smith were found where they had been left inside the store. The knife was still stuck in Smith's back. Inside defendant's briefcase, in addition to the jewelry, were another speedy loader, two rolls of tape, some white twine, and a pair of gloves.

After his arrest, defendant told the police he stabbed Smith because Smith had been "uncooperative and antagonistic"; defendant felt he had to kill him "to keep control of the situation." He said that the "knife went in just like butter." After the stabbing, Smith had strained at his bonds, and appeared close to freeing his hands. Defendant got his gun and pointed it at Smith, intending to shoot him if he got free. It was not necessary.

Defendant said he shot Heilperin because "he felt that he had to kill another hostage in order to prove that his demands should be taken seriously." He selected Heilperin because she had been uncooperative with him and had created the hostage situation by screaming at the outset of the robbery.

Defendant also said he was sorry, and that his plan had been only to tie up the employees, take the jewelry, and leave. He expressed regret when he was erroneously told that Taylor, one of the survivors, had been killed.

B. *Other Crimes*

The prosecution presented evidence of three prior instances in 1984 and 1985 in which defendant forcibly resisted arrest in Las Vegas, Nevada. On

the first occasion, a police officer was attempting to handcuff defendant in a crowded computer store after defendant had attempted to sell two computers that had been stolen in a recent burglary. Defendant fled. He pushed his way through two officers, broke through a sliding glass door, knocked down some store customers, and escaped after breaking the store's front door off its hinges. On the second occasion, defendant also resisted when an officer tried to handcuff him. On the third occasion, defendant was arrested for suspected possession of cocaine. He fled on foot, and then kicked and resisted the officers when he was eventually captured. It took several officers to subdue him.

On February 2, 1986, defendant robbed a jewelry store in Las Vegas at gunpoint. He forced the two employees to lie on the floor and taped their hands and feet. He threatened to kill the employees, abused them verbally, and kicked one of them repeatedly. He eventually escaped with jewelry worth over $400,000 retail, or $177,555 wholesale. The employees identified defendant as the gunman, and his palm print was found on a roll of tape recovered from the store.

Defendant had two prior felony convictions in Nevada, one each for burglary and possession of stolen property.

C. *Defense Evidence*

Defendant's mother and other family members testified about defendant's childhood, some coming from Greece to do so. The marriage of defendant's parents, both natives of Greece, had been arranged, and was never a success. The father abused the family, including defendant and his three older siblings. His mother divorced his father when defendant was five years old. Thereafter, the family generally lived in poverty, often relying on welfare. Defendant was a good child, and was supportive of his mother and the family. For a while defendant lived at a Greek Orthodox Church orphanage, where he was unhappy. Defendant also lived in Greece for a few years. Later, he was in the United States Army. Defendant's brother testified that defendant became involved with the wrong kind of friends in Las Vegas, and thereby got into trouble.

The family members testified that the family was close, that they all loved defendant, and that they wanted him to live.

## II. DISCUSSION

A. *Jury Selection Issues*

Defendant contends the court erred in excusing for cause one prospective juror because of her views on the death penalty. The applicable

law is settled. ■ The trial court may excuse a prospective juror for cause if that juror's views on capital punishment would prevent or substantially impair the performance of her duties as a juror in accordance with her instructions and her oath. (*Wainwright* v. *Witt* (1985) 469 U.S. 412, 424 [83 L.Ed.2d 841, 851-852, 105 S.Ct. 844]; *People* v. *Cooper* (1991) 53 Cal.3d 771, 809 [281 Cal.Rptr. 90, 809 P.2d 865].) "On appeal, if the prospective juror's responses are equivocal, i.e., capable of multiple inferences, or conflicting, the trial court's determination of that juror's state of mind is binding." (*Cooper, supra,* at p. 809.)

■ Early in the voir dire, the prospective juror at issue stated that she had a "predisposition to have already made up [her] mind" to vote for life without possibility of parole. Further questioning revealed that she might vote for the death penalty for an older defendant who had previously committed murder. She said that her views would "impair [her] ability to be totally objective" in a case like this that did not involve a repeat murderer. At one point, she stated that she could not vote for the death penalty in this case given the absence of a prior murder. Other portions of the voir dire, particularly the responses to questions by defense counsel, were more equivocal, but her final statement was that defendant's age and lack of prior murder "makes me feel as though sitting right here right now, if I had to vote, I would vote for not giving the death penalty. And that is what my feeling is."

Defendant contends that the prospective juror was merely predisposed "to assign greater than average weight to the mitigating factors" of age and absence of a previous murder, and that such predisposition alone did not warrant her excusal. (*People* v. *Kaurish* (1990) 52 Cal.3d 648, 699 [276 Cal.Rptr. 788, 802 P.2d 278].) However, these statements, although equivocal, support the court's finding that her views would prevent or substantially impair the performance of her duties as a juror.

The fact that the prospective juror may have considered the death penalty in other cases also did not prevent her excusal. "[A] court may properly excuse a prospective juror who would automatically vote against the death penalty in the case before him, regardless of his willingness to consider the death penalty in other cases." (*People* v. *Fields* (1983) 35 Cal.3d 329, 357-358 [197 Cal.Rptr. 803, 673 P.2d 680]; accord *People* v. *Pinholster* (1992) 1 Cal.4th 865, 917-918 [4 Cal.Rptr.2d 765, 824 P.2d 571].) That was the situation here. Although the prospective juror indicated a willingness to consider the death penalty under facts not applicable to the case (a prior murder), the trial court properly found that her ability to perform her duty was substantially impaired in *this* case. (See also *People* v. *Pinholster, supra,*

1 Cal.4th at pp. 916-918 [trial court properly excused a prospective juror who indicated an inability to consider the death penalty in a burglary-murder case, even though the juror could consider it in other situations].)

Defendant also contends the district attorney improperly used peremptory challenges to exclude potential jurors who expressed reservations about the death penalty. We have repeatedly rejected the contention, and continue to do so. (E.g., *People* v. *Edwards* (1991) 54 Cal.3d 787, 831 [1 Cal.Rptr.2d 696, 819 P.2d 436].)

### B. *Physical Restraint of Defendant During Trial*

Defendant contends the trial court prejudicially erred in ordering him physically restrained on two occasions during the trial.

#### 1. *The Facts*

During jury selection, the deputy district attorney notified the court that the sheriff's department had received information from a confidential informant regarding a possible escape attempt by defendant with outside help. Because of this information and defendant's history of escape attempts, she requested that defendant be shackled with an "unobtrusive" leg brace to be worn under his pants. Defense counsel objected, and claimed that the brace was noticeable and uncomfortable. After hearing from defense counsel and the deputy sheriff, the court ordered the leg brace worn for the rest of the day pending a final decision that evening.

At the end of the jury selection proceedings that day, another hearing was held. Over objection of the district attorney, the court decided that with increased security the leg brace would not be necessary, and ordered it removed. The leg brace was thus worn only during one day of jury selection. Nothing in the record suggests that any prospective juror observed the brace.

During the evidence portion of trial, the district attorney requested that defendant be restrained in some fashion during the testimony of the two surviving hostages. She said that Carol Lambert told her that "she will not come into court and testify unless he is [restrained]. She is that fearful of him." Both of the hostages were still "in therapy" because of the crime. The district attorney said that although Robert Taylor had also requested defendant be restrained, she could talk him into testifying without the restraints. Lambert, however, would "absolutely not come into the courtroom unless he is somehow restrained." The defense objected that there was no necessity for the restraint. The court responded that "a person who has gone through that

particular trauma has ideas that don't occur to an ordinary person. We have to respect that feeling"; and that "obviously there is no necessity because there is security, but we are dealing with a subjective frame of mind of a woman who has gone through a terrible trauma so, therefore, we have got to humor her. It might not be objectively the thing to do but under the circumstances, I think we ought to do that."

The court ordered that during the testimony of Lambert only, not that of Taylor, defendant be handcuffed to his chair in a fashion that would not be visible to the jury. Defendant was not otherwise physically restrained during the trial.

### 2. *Discussion*

Defendant contends the court erred in ordering the leg brace for the one day during jury selection and the handcuffing during the testimony of Lambert. We disagree.

■ It is settled that because of its potentially prejudicial impact on the jury, shackling should be ordered only as a last resort and only upon a showing of a manifest need for such restraints. (*People* v. *Stankewitz* (1990) 51 Cal.3d 72, 94-95 [270 Cal.Rptr. 817, 793 P.2d 23]; *People* v. *Duran* (1976) 16 Cal.3d 282, 290-291 [127 Cal.Rptr. 618, 545 P.2d 1322, 90 A.L.R.3d 1.) Any restraints should be as "unobtrusive as possible, although as effective as necessary under the circumstances." (*People* v. *Duran, supra,* 16 Cal.3d at p. 291.) Although these restrictions make the trial court's discretion to order restraints "relatively narrow" (*People* v. *Cox* (1991) 53 Cal.3d 618, 651 [280 Cal.Rptr. 692, 809 P.2d 351]), the court's ruling will be upheld on appeal absent a showing of a manifest abuse of that discretion. (*People* v. *Stankewitz, supra,* 51 Cal.3d at p. 95.)

■ The court did not abuse its discretion in this case. The information regarding the possible escape plans, together with defendant's history of prior escape attempts, was a sufficient basis for the temporary leg brace. (*People* v. *Sheldon* (1989) 48 Cal.3d 935, 945-946 [258 Cal.Rptr. 242, 771 P.2d 1330].) It is not necessary that the restraint be based on the conduct of the defendant at the time of trial. (*Kennedy* v. *Cardwell* (6th Cir. 1973) 487 F.2d 101, 111.)[2] The trial court attempted to make the restraint as unobtrusive as possible, and promptly ordered it removed as soon as it was satisfied there was sufficient courtroom security to make it unnecessary. Moreover, it

---

[2]In *People* v. *Duran, supra,* 16 Cal.3d 282, the leading California case on shackling, we relied heavily on *Kennedy* v. *Cardwell, supra,* 487 F.2d 101, and specifically commended its "enlightening" analysis. (16 Cal.3d at p. 293, fn. 13.)

was inevitable that the jury would learn of defendant's prior escape attempts. (*Kennedy* v. *Cardwell, supra,* 487 F.2d at p. 111.) Evidence of the prior escape attempts, coupled with the evidence of the crime, would make it obvious to the jury that defendant *was* a security risk. The leg brace, even if noticed by one or more prospective jurors (the record does not suggest that any did notice it), would have had little prejudicial effect under the circumstances.

■ Defendant has also not shown error regarding the handcuffing during the testimony of former hostage Lambert. Although the restraint was not imposed for reasons of courtroom security, there was still a sufficient showing of need to support the court's exercise of discretion. Defendant had terrorized Lambert for 13 harrowing hours, during which time he cold-bloodedly murdered 2 other bound hostages while she lay helpless on the floor next to them. Her fear at trial was understandable. Under these circumstances, the trial court's carefully limited attempt to alleviate this fear by requiring handcuffs, invisible to the jury and worn only for a short time, was within its discretion.

■ Defendant also contends the court erred in not cautioning the jury sua sponte that the restraints should not influence its determination. "However, when the restraints are concealed from the jury's view, this instruction should not be given unless requested by defendant since it might invite initial attention to the restraints and thus create prejudice which would otherwise be avoided." (*People* v. *Duran, supra,* 16 Cal.3d at p. 292; accord *People* v. *Cox, supra,* 53 Cal.3d at p. 655.) Although defense counsel claimed at trial that the leg brace was noticeable, the court and district attorney disagreed. The record contains no evidence that any juror actually observed the leg brace. There is no suggestion at all that the handcuffs were noticeable. Under the circumstances, defendant should have requested the cautionary instruction if he wanted it. (*People* v. *Cox, supra,* 53 Cal.3d at p. 655.)

## C. *Evidence of Prior Unadjudicated Crimes*

Over objection, the court admitted evidence of the three instances in which defendant forcibly resisted arrest, including evidence that on one of the occasions defendant had attempted to sell two computers stolen in an earlier burglary, and that on another of the occasions defendant possessed what the arresting officer believed was cocaine.[3] Evidence of the circumstances preceding the arrests was also admitted. The theft and possession of the computers underlay defendant's felony convictions for possession of stolen property and burglary.

---

[3]Although defendant did not specifically object to the evidence regarding the cocaine, we believe that defendant's general objections on the grounds argued on appeal to all of this

Defendant contends that the evidence regarding the possession of stolen property and the suspected cocaine, and the circumstances surrounding the arrests, should not have been admitted because it did not show "criminal activity by the defendant which involved the use or attempted use of force or violence or the express or implied threat to use force or violence" under section 190.3, factor (b). He further argues that section 190.3, factor (c), which allows evidence of any "prior felony conviction," does not permit evidence of the facts underlying the conviction.

■ Defendant is correct that the evidence regarding the computers was not admissible to show the circumstances surrounding his felony convictions. Any "prior felony conviction," even of a nonviolent felony, is admissible under section 190.3, factor (c). However, under factor (c), only the fact of the *conviction* is admissible, not the underlying facts of the crime. (See *People* v. *Gates* (1987) 43 Cal.3d 1168, 1203 [240 Cal.Rptr. 666, 743 P.2d 301] ["Defendant's contention [that the facts underlying a felony conviction were inadmissible] might have had merit had the convictions involved *nonviolent* conduct, since the admission of such evidence is strictly limited by subdivision (c) of section 190.3." Italics in the original.].) Evidence of the *facts* of criminal activity, whether or not accompanied by a conviction, is admissible under section 190.3, factor (b), but only if the activity involves force or violence. (See *People* v. *Cooper, supra,* 53 Cal.3d at p. 840; *People* v. *McDowell* (1988) 46 Cal.3d 551, 567-568 [250 Cal.Rptr. 530, 758 P.2d 1060].)

Although the record is not completely clear, it appears the court did believe the prosecution was entitled to admit evidence of the underlying facts of felony convictions under section 190.3, factor (c). Admission of the evidence solely on this basis would have been error. The evidence of the possession of the stolen computers and of the suspected cocaine was, however, admissible under section 190.3, factor (b).

The prosecution was not limited under section 190.3, factor (b), to showing only that defendant was arrested for no apparent reason, and that he then violently resisted those arrests. "Section 190.3, factor (b), refers to 'criminal activity,' not specific crimes." (*People* v. *Cooper, supra,* 53 Cal.3d at p. 840.) Therefore, although the activity must involve specific crimes, "all crimes committed during a continuous course of criminal activity which includes force or violence may be considered in aggravation even if some portions thereof, in isolation, may be nonviolent." (*Id.* at p. 841.) The resisting of the arrests and the subsequent batteries certainly involved force or violence. The

evidence, which were overruled, were sufficient to satisfy the contemporaneous objection rule. (Evid. Code, § 353.)

possessions of the computers and cocaine did not themselves involve force or violence, but they were the crimes leading to the arrests which defendant resisted, and were thus part of the same "continuous course of criminal activity which includes force or violence." (*Ibid.*) The underlying crimes and surrounding circumstances "were admissible to give context to defendant's subsequent violent episode[s]" of resistance. (*People* v. *Keenan* (1988) 46 Cal.3d 478, 526 [250 Cal.Rptr. 550, 758 P.2d 1081]; see also *People* v. *Pinholster, supra,* 1 Cal.4th at p. 961.)

■ Defendant next contends the court erred in instructing on the elements of both resisting arrest and battery on a peace officer. He argues that resisting arrest, standing alone, does not necessarily involve force or violence. Section 190.3, factor (b), however, does not require that any specific crime *inherently* involve force or violence, only that the *actual* criminal activity be violent. (See *People* v. *Cooper, supra,* 53 Cal.3d at pp. 840-841.) He also argues the jury might have found on each occasion that he committed both crimes, thus leading to impermissible double counting of aggravating factors. The court did not, however, specify for the jury which evidence could be considered as to each crime on which it was instructed. Nor was it required to do so absent a request. (*People* v. *Hardy* (1992) 2 Cal.4th 86, 205-206 [5 Cal.Rptr.2d 796, 825 P.2d 781].) The evidence supported a finding that defendant committed each offense, with the requisite force or violence, at least once. The instructions were proper.[4]

Defendant finally contends the admission of the prior unadjudicated crimes denied him due process and a reliable death judgment. He recognizes that we rejected these contentions in *People* v. *Balderas* (1985) 41 Cal.3d 144, 204-205 [222 Cal.Rptr. 184, 711 P.2d 480], but urges us to overrule that decision. We decline to do so. (See *People* v. *Medina* (1990) 51 Cal.3d 870, 906-907 [274 Cal.Rptr. 849, 799 P.2d 1282].)

### D. *Exclusion of Defense Evidence*

Defendant's mother testified that when she visited defendant in jail, he said he was "very sorry" about what he did. The court sustained a hearsay objection to the testimony, but the district attorney did not request it be stricken. On redirect examination, the mother testified without objection that defendant "tells me how sorry he is."

During the examination of defendant's uncle, the court sustained hearsay objections to questions about the contents of letters defendant wrote after his

---

[4]It would have been improper to instruct on the elements of crimes, such as possession of stolen property and cocaine, that did not themselves involve actual violence. (*People* v. *Cooper, supra,* 53 Cal.3d at p. 841.) The court did not do so.

arrest, about statements he allegedly made in jail, and about whether the defendant is "sorry" for what he did.

Defense counsel asked defendant's brother whether defendant has shown remorse. He answered, "I believe so, very much so." The court sustained an objection to the testimony, but the district attorney did not request it be stricken.

Defendant argues that the court prejudicially erred in sustaining the objections. For the first time on appeal, he contends the evidence was admissible under the state-of-mind exception to the hearsay rule (Evid. Code, § 1250), and that its exclusion violated his rights under the Eighth and Fourteenth Amendments to the federal Constitution. The Attorney General preliminarily argues that defendant has waived the contention for failure to make an offer of proof at trial. We agree that the matter has not been preserved for appeal.

An appellate court may not reverse a judgment because of the erroneous exclusion of evidence unless the "substance, purpose, and relevance of the excluded evidence was made known to the court by the questions asked, an offer of proof, or by *any other means*." (Evid. Code, § 354, subd. (a), italics added; see *People* v. *Whitt* (1990) 51 Cal.3d 620, 648 [274 Cal.Rptr. 252, 798 P.2d 849].) Defendant did not make an offer of proof. However, two of the witnesses actually answered the questions before the objections were sustained. The answers, together with the questions asked, were "other means" which made it known to the court that the excluded evidence was offered to show remorse as a mitigating factor. This satisfied part of the Evidence Code section 354 requirement. However, defendant did not show that the testimony came within an exception to the hearsay rule, and did not attempt, by offer of proof or otherwise, to lay the proper foundation for that exception.

■ The proponent of hearsay has to alert the court to the exception relied upon and has the burden of laying the proper foundation. In *People* v. *Rodriguez* (1969) 274 Cal.App.2d 770 [79 Cal.Rptr. 240], the defendant argued on appeal that certain excluded hearsay was admissible as a statement against penal interest. The Court of Appeal found the issue had not been properly preserved: "[A]fter the court sustained the objection, appellant's trial counsel failed to inform the court that he was offering the witness's testimony as an exception to the hearsay rule. Under Evidence Code sections 403 and 405, if a hearsay objection is properly made, the burden shifts to the party offering the hearsay to lay a proper foundation for its admissibility under an exception to the hearsay rule." (*Id.* at p. 777; see also 3 Witkin, Cal.

Evidence (3d ed. 1986) Introduction of Evidence at Trial, § 1726, p. 1681 ["[T]he conditions of admissibility [of hearsay], designed to exclude untrustworthy hearsay, are determined finally by the judge, and the proponent has the burden of proving them. (Ev.C. 405, Comment; . . . .)"].)

Evidence Code section 405 provides with regard to preliminary fact determinations governed by that section: "(a) When the existence of a preliminary fact is disputed, the court shall indicate which party has the burden of producing evidence and the burden of proof on the issue as implied by the rule of law under which the question arises. The court shall determine the existence or nonexistence of the preliminary fact and shall admit or exclude the proffered evidence as required by the rule of law under which the question arises." The Law Revision Commission Comment to that section states that questions relating "to the existence of those circumstances that make the hearsay sufficiently trustworthy to be received in evidence— e.g., was the declaration spontaneous, the confession voluntary, the business record trustworthy?" are decided under that section.

Defendant did not even suggest the hearsay statements were admissible under some exception, and certainly did not show that the evidence qualified for admission under the state-of-mind exception. (Evid. Code, § 1250.) This was especially important in this case, for if the issue had been properly presented to the court, it would have had discretion to exclude the evidence. Evidence of the declarant's state of mind, even if otherwise admissible under Evidence Code section 1250, is inadmissible "if the statement was made under circumstances such as to indicate its lack of trustworthiness." (Evid. Code, § 1252.)

In *People* v. *Edwards, supra,* 54 Cal.3d at pages 818-821, the defense sought to introduce a taped statement by the defendant shortly after his arrest, and a notebook he compiled shortly after the crime. We rejected the defendant's arguments that the evidence, though hearsay, was admissible under the state-of-mind exception to the hearsay rule. We found that the postcrime statements were made at a time when the defendant "had a compelling motive to deceive and seek to exonerate himself from, or at least to minimize his responsibility for," the crimes. (*Id.* at p. 820.) There was thus " 'ample ground to suspect defendant's motives and sincerity' when he made the statements." (*Ibid.,* quoting *People* v. *Whitt, supra,* 51 Cal.3d at p. 643.) "The need for cross-examination is especially strong in this situation, and fully warrants exclusion of the hearsay evidence." (*Edwards, supra,* at p. 820; see also *People* v. *Harris* (1984) 36 Cal.3d 36, 69 [201 Cal.Rptr. 782, 679 P.2d 433] (plur. opn. by Broussard, J.) ["A defendant in a criminal case may not introduce hearsay evidence for the purpose of testifying while avoiding cross-examination."].)

In this case, the trial court may well have excluded the evidence if given the opportunity to rule on the question. While defendant was in jail awaiting trial he certainly had a motive to claim remorse. His sincerity in telling potential defense witnesses he was sorry was suspect. The need for cross-examination was thus compelling. The court would have had discretion to find a lack of trustworthiness in the claims of remorse, and thus to exclude the evidence if asked to rule on the question. (*People* v. *Gordon* (1990) 50 Cal.3d 1223, 1250-1251 [270 Cal.Rptr. 451, 792 P.2d 251].) Since the court was never asked to exercise this discretion, the issue is not properly before us.

 Defendant contends that exclusion of the evidence violated his federal constitutional right to have the sentencer consider all " 'relevant mitigating evidence.' " (*Payne* v. *Tennessee* (1991) 501 U.S. __, __ [115 L.Ed.2d 720, 733, 111 S.Ct. 2597, 2606]; *Skipper* v. *South Carolina* (1986) 476 U.S. 1, 4, 6 [90 L.Ed.2d 1, 6, 106 S.Ct. 1669].) Even if the contention were properly before us, we would reject it on the merits. As explained in *People* v. *Edwards, supra*, 54 Cal.3d 787, a state is generally not required to admit evidence in a form inadmissible under state law. (*Id.* at pp. 837-838 [discussing a limited exception under *Green* v. *Georgia* (1979) 442 U.S. 95 (60 L.Ed.2d 738, 99 S.Ct. 2150)].) The same lack of reliability that makes the statements excludable under state law makes them excludable under the federal Constitution.

Defendant also contends the rulings violated his due process rights. We would also reject that claim on the merits if it were properly before us. Based upon his statements during the hostage crisis itself, the district attorney argued that defendant was not remorseful for his crimes. Defendant contends the court's rulings prevented him from rebutting this evidence and argument. Again, we disagree. The court did not prevent defendant from presenting evidence of remorse, but only evidence in the form of inadmissible hearsay not subject to cross-examination. We note also that the jury did hear of defendant's statement to the police shortly after the arrest that he was sorry for the crimes. There was no constitutional violation.

E. *Jury Instruction Issues*

1. *Instruction During Jury Selection*

During jury selection, the court briefly summarized the penalty phase process to the prospective jurors. Defendant contends that the explanation to many of the prospective jurors, including several who actually served on the jury, was defective. As an example, defendant cites this

explanation to one juror: "You see, the law in California is that if the aggravating circumstances outweigh the mitigating circumstances, then you must bring in a verdict of death in the gas chamber." Defendant contends this improperly imposed a mandatory death penalty. (See *People* v. *Brown* (1985) 40 Cal.3d 512, 540-545 [220 Cal.Rptr. 637, 709 P.2d 440], revd. on other grounds *sub nom. California* v. *Brown* (1987) 479 U.S. 538 [93 L.Ed.2d 934, 107 S.Ct. 837.)

We need not decide whether these summary comments, by themselves, fully and correctly instructed on the deliberative process. The comments were not the actual complete jury instructions. The full instructions came at the end of the trial, and fully satisfied the concerns addressed in *People* v. *Brown, supra,* 40 Cal.3d 512. Indeed, the court gave instructions substantially identical to those approved in *Brown. (Id.* at p. 545, fn. 19.)

"The purpose of these comments was to give prospective jurors, most of whom had little or no familiarity with courts in general and penalty phase death penalty trials in particular, a general idea of the nature of the proceeding. The comments were not intended to be, and were not, a substitute for full instructions at the end of trial." (*People* v. *Edwards, supra,* 54 Cal.3d at p. 840.) "If defendant wanted the court to give a fuller explanation during jury selection, he should have requested it." (*Id.* at p. 841.) He did not do so.

### 2. *Instruction on Mercy*

▆▆▆ Defendant contends the court had a sua sponte duty to instruct the jury that it "had the absolute discretion to exercise mercy and impose a life sentence, even in the face of a finding on [its] part that death was appropriate." We have, however, repeatedly held that the court is not required to instruct on mercy. (*People* v. *Nicolaus* (1991) 54 Cal.3d 551, 588-589 [286 Cal.Rptr. 628, 817 P.2d 893]; *People* v. *Benson* (1990) 52 Cal.3d 754, 808-809 [276 Cal.Rptr. 827, 802 P.2d 330; *People* v. *Andrews* (1989) 49 Cal.3d 200, 227-228 [260 Cal.Rptr. 583, 776 P.2d 285]; *People* v. *Caro* (1988) 46 Cal.3d 1035, 1067 [251 Cal.Rptr. 757, 761 P.2d 680].)

The court here instructed the jury to consider "any other circumstance which extenuates the gravity of the crime, even though it is not a legal excuse for the crime and any sympathetic or other aspect of the defendant's character or record that the defendant offers as a basis for a sentence less than death, whether or not related to the offense for which he is on trial"; and "defendant's background, character, history and any devotion and affection for his family and they for him and anything favorable to him during his life or any other mitigating circumstance." This instruction is even more expansive than the "catch-all" mitigation instruction suggested in *People* v. *Easley*

(1983) 34 Cal.3d 858, 878, footnote 10 [196 Cal.Rptr. 309, 671 P.2d 813]; it certainly suffices to advise the jury of the full range of mitigating evidence it could consider. Nothing more is required. (*People v. Sully* (1991) 53 Cal.3d 1195, 1245-1246 [283 Cal.Rptr. 144, 812 P.2d 163].)

Contrary to defendant's contention, the district attorney never suggested to the jury that it could not consider mercy. On the other hand, defense counsel in effect urged the jury to "try to show compassion, try to show mercy." There was no error.

### 3. *Instruction on Evidence of the Love of Defendant's Family for Him*

The court instructed the jury to consider in mitigation "any devotion and affection for [defendant's] family and they for him." Defendant contends the court erred in refusing his request to also tell the jury that this evidence "may be sufficient standing alone to warrant the return of a verdict of life . . . ." We disagree.

The court instructed the jury that it was not to mechanically count the factors, but that it was "free to assign whatever moral or sympathetic value you deem appropriate to each and all of the various factors that you are permitted to consider." This correctly instructed the jury on the weight to be given any factor. (See *People v. Sully, supra,* 53 Cal.3d at pp. 1244-1245; *People v. Duncan* (1991) 53 Cal.3d 955, 977-979 [281 Cal.Rptr. 273, 810 P.2d 131]; *People v. Brown, supra,* 40 Cal.3d at p. 545, fn. 19.) There is no duty to tell the jury that any specific fact alone might warrant a verdict of life. (*People v. Breaux* (1991) 1 Cal.4th 281, 316-317 [3 Cal.Rptr.2d 81, 821 P.2d 585]; *People v. Mickey* (1991) 54 Cal.3d 612, 696-698 [286 Cal.Rptr. 801, 818 P.2d 84]; see also *People v. Cooper, supra,* 53 Cal.3d at p. 844 [trial court properly refused to give *any* specific instruction regarding the impact of the verdict on the defendant's family].)

### 4. *Instruction to View Defendant's Admissions With Caution*

After his arrest, defendant talked about the crime to the police. Some of the statements which were admitted at trial were not recorded. Focusing on these nonrecorded statements, defendant contends the court erred in failing to instruct sua sponte that evidence of his oral admissions should be viewed with caution. (See *People v. Beagle* (1972) 6 Cal.3d 441, 456 [99 Cal.Rptr. 313, 492 P.2d 1].) We have previously assumed that the same rule applies to the penalty phase of a capital trial as applies to a trial of guilt, but we have never actually addressed the question. (*People v. Pensinger* (1991) 52 Cal.3d 1210, 1268 [278 Cal.Rptr. 640, 805 P.2d 899]

[noting that the issue was conceded, and engaging solely in a harmless error analysis]; *People* v. *Morales* (1989) 48 Cal.3d 527, 569 [257 Cal.Rptr. 64, 770 P.2d 244].) Because of the differences between guilt and penalty trials, we now hold that the court is required to give the cautionary instruction at the penalty phase only upon defense request.

In the pattern CALJIC instructions, the cautionary admonition is part of a longer instruction that also defines an admission as a statement which "tends to prove [the defendant's] guilt."[5] At the penalty phase, guilt is already established. The only relevance of the defendant's extrajudicial statements is as either aggravating or mitigating evidence, not as evidence of guilt.

Whether a particular statement is aggravating or mitigating is often open to interpretation. Defendant's statements in this case contained elements that were undoubtedly aggravating, such as his statements as to why he killed Smith and Heilperin. Other statements were arguably mitigating, such as his statements that he was sorry and that he had not intended to take hostages, and his expression of regret when erroneously told that Taylor had been killed. Indeed, virtually at the outset of his argument to the jury, defense counsel stressed defendant's expressions of remorse.[6] In light of this, it is far from clear that defendant would benefit from an instruction that his oral admissions should be viewed with caution.

In *People* v. *Vega* (1990) 220 Cal.App.3d 310 [269 Cal.Rptr. 413], a noncapital case, the defendant contended the trial court erred in *giving* CALJIC No. 2.71. He argued that his statements were both inculpatory and exculpatory, and that the instruction prejudicially told the jury to view his exculpatory statements with caution. The appellate court rejected the argument, finding that because the instruction defined an admission as a statement tending to prove guilt, "a jury is capable of discerning whether an extrajudicial statement is an admission, which they are instructed to view

---

[5]The entire standard instruction states: "An admission is a statement by the defendant other than at his trial which does not by itself acknowledge his guilt of the crimes for which such defendant is on trial, but which statement tends to prove his guilt when considered with the rest of the evidence.

"You are the exclusive judges as to whether the defendant made an admission, and if so, whether such statement is true in whole or in part. If you should find that the defendant did not make the statement, you must reject it. If you find that it is true in whole or in part, you may consider that part which you find to be true.

"Evidence of an oral admission of the defendant should be viewed with caution." (CALJIC No. 2.71 (5th ed.), as adapted to fit this case.)

[6]Defense counsel argued: "Steven Livaditis was taken to the Beverly Hills jail and then taken to the hospital ward of the county jail and he was there and there were several officers there with him and he rambled and he said, 'This is a tragedy. I am sorry. I am sorry this happened.' He rambled on in that nature for quite a while."

with caution, or whether the statement is not an admission, to which the cautionary language does not apply." (220 Cal.App.3d at p. 318.)

At a penalty phase, the distinction between mitigation and aggravation is often more blurred than the distinction between a statement that incriminates and one that does not. A statement, for example, that the defendant is sorry he stabbed the victim to death is both mitigating and aggravating. It admits guilt but also expresses remorse. It is unclear whether the defense would desire the court to tell the jury to view such a statement with caution. Therefore, the guilt-phase sua sponte duty should not apply to the penalty phase. The cautionary instruction need be given at a penalty phase only upon request. Since there was no request in this case, there was no error.

■ Any error would additionally have been harmless. "The purpose of the cautionary instruction is to assist the jury in determining if the statement was in fact made." (*People* v. *Beagle, supra,* 6 Cal.3d at p. 456.) "The testimony concerning defendant's oral admission was uncontradicted; defendant adduced no evidence that the statement was not made, was fabricated, or was inaccurately remembered or reported. There was no conflicting testimony concerning the precise words used, their context or their meaning." (*People* v. *Stankewitz, supra,* 51 Cal.3d at p. 94; see also *People* v. *Pensinger, supra,* 52 Cal.3d 1210, 1268.) In addition, as noted, the defense, as well as the prosecution, relied on the statements. There is no reasonable possibility that the failure to give the cautionary instruction affected the penalty verdict. (*People* v. *Stankewitz, supra,* at p. 94.)

### 5. *Failure to Label the Factors as Either Mitigating or Aggravating*

Defendant contends the trial court was required to label the sentencing factors as either mitigating or aggravating. We have repeatedly rejected this contention. (*People* v. *Bacigalupo* (1991) 1 Cal.4th 103, 148 [2 Cal.Rptr.2d 335, 820 P.2d 559]; *People* v. *Gallego* (1990) 52 Cal.3d 115, 198 [276 Cal.Rptr. 679, 802 P.2d 169].)

■ Defendant also claims the court was required to instruct the jury that the absence of a mitigating factor is not itself aggravating. Although that would be a correct statement of the law (*People* v. *Davenport* (1985) 41 Cal.3d 247, 289-290 [221 Cal.Rptr. 794, 710 P.2d 861]), a specific instruction to that effect is not required, at least not unless the court or parties make an improper contrary suggestion. "A jury properly advised about the broad scope of its sentencing discretion is unlikely to conclude that the *absence* of such unusual factors as 'extreme' emotional disturbance, victim consent, or reasonable belief in moral justification [citations] is entitled to significant

aggravating weight." (*People* v. *Melton* (1988) 44 Cal.3d 713, 769 [244 Cal.Rptr. 867, 750 P.2d 741], italics in original.) No one suggested here that the mere absence of a mitigating factor was aggravating.

### 6. *Age as an Aggravating Factor*

The district attorney argued that defendant's age, 22 years at the time of the crime, could be considered as either mitigating or aggravating. She argued that although defendant was very young, "look at what he has done," and commented that if someone committed three murders by defendant's age, some might conclude that "there is no hope for that person."

Defendant argues that the court should have instructed the jury that age can only be considered mitigating or neutral but never aggravating. That is not the law. (*People* v. *Visciotti* (1992) 2 Cal.4th 1, 76-77 [5 Cal.Rptr.2d 495, 825 P.2d 388]; *People* v. *Medina, supra,* 51 Cal.3d at p. 909; *People* v. *Lucky* (1988) 45 Cal.3d 259, 302 [247 Cal.Rptr. 1, 753 P.2d 1052]; see also *People* v. *Bacigalupo, supra,* 1 Cal.4th at p. 153 (conc. opn. of Mosk, J.).)

The district attorney did not improperly argue that "chronological age alone" was aggravating. (*People* v. *Visciotti, supra,* 2 Cal.4th at p. 76.) Rather, she argued that although the chronological age suggested mitigation, the jury should consider how much criminal behavior defendant had committed in a short time. This was proper, just as it would be proper for the defense to argue the age factor was mitigating. (See *People* v. *Edwards, supra,* 54 Cal.3d at p. 844.) Criminal behavior condensed into a short time period could reasonably be considered more serious than the same behavior spread out over a long time. Contrary to defendant's claim, we also find no impermissible double counting of penalty factors.

### 7. *Miscellaneous Instructional Contentions*

We reiterate the following holdings:

(a) The court need not instruct the jury it could consider other crimes evidence only if it *unanimously* found such crimes had been proved beyond a reasonable doubt. (*People* v. *Gordon, supra,* 50 Cal.3d at p. 1273; *People* v. *Miranda* (1987) 44 Cal.3d 57, 99 [241 Cal.Rptr. 594, 744 P.2d 1127].)

(b) The instructions on the deliberative process approved in *People* v. *Brown, supra,* 40 Cal.3d at page 545, footnote 19, are constitutional. (*People* v. *Nicolaus, supra,* 54 Cal.3d at pp. 590-591, and cases cited therein; *People* v. *Duncan, supra,* 53 Cal.3d at pp. 978-979.)

(c) The court need not instruct the jury that it could return a verdict of death only if it were persuaded beyond a reasonable doubt (i) of the existence of each aggravating factor, (ii) that the aggravating factors out-weighed the mitigating factors, and (iii) that death was the appropriate penalty. (*People* v. *Marshall* (1990) 50 Cal.3d 907, 935-936 [269 Cal.Rptr. 269, 790 P.2d 676].)

(d) The court need not require a written statement from the jury detailing the evidence upon which it relied and the reasons for imposing the death penalty. (*People* v. *Kelly* (1990) 51 Cal.3d 931, 970 [275 Cal.Rptr. 160, 800 P.2d 516]; *People* v. *Medina, supra*, 51 Cal.3d at pp. 909-910.)

(e) The court need not clarify the section 190.3, factor (b), instruction to state that it refers to violent criminal conduct other than the crimes charged in this proceeding. (*People* v. *Sanders* (1990) 51 Cal.3d 471, 528 [273 Cal.Rptr. 537, 797 P.2d 561]; *People* v. *Bonin* (1988) 46 Cal.3d 659, 703-704 [250 Cal.Rptr. 687, 758 P.2d 1217].)

(f) The court need not delete inapplicable mitigating factors from its instructions. (*People* v. *Kelly, supra*, 51 Cal.3d at p. 968.)

F. *Accumulated Error*

Defendant contends the cumulative effect of the asserted errors requires reversal of the penalty verdict. There was, however, no error to accumulate.

G. *Propriety of the Death Penalty*

Defendant reiterates constitutional challenges to the 1978 death penalty law which we have long since rejected, and which we continue to reject. (E.g., *People* v. *Rodriquez* (1986) 42 Cal.3d 730, 777-779 [230 Cal.Rptr. 667, 726 P.2d 113].)

He also argues that we must engage in a comparative sentence review in order to determine whether his sentence is disproportionate. We have con-sistently declined to undertake such review, and continue to do so. (*People* v. *Cox, supra*, 53 Cal.3d at p. 691; *People* v. *Sanders, supra*, 51 Cal.3d at p. 529.) Given the extraordinarily heinous nature of defendant's crimes, the death sentence is certainly not so disproportionate that it shocks the con-science and offends fundamental notions of human dignity. (*People* v. *Cox, supra*, 53 Cal.3d at p. 690; *People* v. *Frierson* (1979) 25 Cal.3d 142, 183 [158 Cal.Rptr. 281, 599 P.2d 587] (plur. opn. by Richardson, J.).)

H. *Automatic Motion to Modify Death Verdict*

Defendant contends the court erroneously read and considered the probation report prior to ruling on the automatic motion to modify the

verdict under section 190.4, subdivision (e). He is correct that in ruling on the motion, the court reviews only the evidence presented to the jury, which does not include the probation report. (*People* v. *Williams* (1988) 45 Cal.3d 1268, 1329 [248 Cal.Rptr. 834, 756 P.2d 221].)

The record indicates that the court had read the probation report before ruling on the automatic motion. However, absent a contrary indication in the record, we assume that the court was not influenced by the report in ruling on the motion. (*People* v. *Lewis* (1990) 50 Cal.3d 262, 287 [266 Cal.Rptr. 834, 786 P.2d 892]; *People* v. *Williams, supra,* 45 Cal.3d at p. 1329.) Here, we need not rely on such an assumption; the record affirmatively shows the court was not influenced by the report.

At the outset of its ruling, the court stated, "I am required under the law in ruling on the application to review the *evidence,* which I have, and I have considered and am taking that into account . . . ." (Italics added.) The court then discussed the reasons it was denying the motion, all of which were based on, and amply supported by, the evidence presented at trial. After this discussion, the court expressly stated that these were its "reasons for ruling on the application"; it directed that they be entered in the clerk's minutes.

*After* the court denied the automatic motion, and after the defense waived arraignment for judgment and stated there was no legal cause why judgment should not be pronounced, the court discussed whether it should modify the judgment on its "own motion." It concluded that there was no basis upon which to do so. Only during this discussion did the court refer to the contents of the probation report. The record thus shows that the court was aware of, and properly performed, its duty to base the modification motion solely on the evidence presented to the jury. Its consideration of the report only came after that ruling in discussing whether there was any other basis upon which to modify the judgment. There was no error, and certainly no prejudice.

### III. CONCLUSION

The judgment is affirmed.

Lucas, C. J., Panelli, J., Kennard, J., Baxter, J., and George, J., concurred.

MOSK, J.—I concur in the judgment. After review, I have found no reversible error or other defect.

I also generally concur in the majority opinion. On most matters, its reasoning is persuasive and its result correct.

I write separately because, unlike the majority, I believe that the trial court erred by failing to instruct the jury, sua sponte, that they should view the evidence of defendant's oral admissions with caution.

In 1872, the Legislature enacted the Code of Civil Procedure. In pertinent part, section 2061 of that code required trial courts to give certain cautionary instructions "on all proper occasions," in both civil and criminal cases. Its source was the common law. (Recommendation Proposing an Evidence Code (Jan. 1965) 7 Cal. Law Revision Com. Rep. (1965) p. 358.) Among the specified admonitions was this: "That . . . the evidence of the oral admissions of a party [ought to be viewed] with caution . . . ." (Code Civ. Proc., § 2061, subd. 4 (1872).) As relevant here, section 1870 of the same code effectively defined "admission" as a statement adverse to the party's interest at trial. (*Id.*, subd. 2.) Its source, too, was the common law. (See *Hall* v. *Bark "Emily Banning"* (1867) 33 Cal. 522, 523-524 [impliedly recognizing substantially the same definition under the common law].)

The reason for requiring a cautionary instruction on oral admissions is virtually self-evident.

". . . The dangers inherent in the use of [evidence of oral admissions] are well recognized by courts and text writers. 'It is a familiar rule that verbal admissions should be received with *caution* and subjected to careful scrutiny, as no class of evidence is more subject to error or abuse. Witnesses having the best motives are generally unable to state the exact language of an admission, and are liable, by the omission or the changing of words, to convey a false impression of the language used. No other class of testimony affords such temptations or opportunities for unscrupulous witnesses to torture the facts or commit open perjury, as it is often impossible to contradict their testimony at all, or at least by any other witness than the party himself.' It was undoubtedly such considerations that led the Legislature to make the admitting of extrajudicial admissions into evidence conditional on the giving of a cautionary instruction." (*People* v. *Bemis* (1949) 33 Cal.2d 395, 398-399 [202 P.2d 82], italics in original and citation omitted; accord, e.g., *Smellie* v. *Southern Pacific Co.* (1931) 212 Cal. 540, 560 [299 P. 529]; see *Smith* v. *Whittier* (1892) 95 Cal. 279, 297 [30 P. 529] [stating that "[a]dmissions are generally regarded as weak evidence for the proof of a fact, and are never conclusive of the facts stated, or of the inference to be drawn therefrom"]; *Monsen* v. *Monsen* (1916) 174 Cal. 97, 103 [162 P. 90] [quoting *Smith* with approval].)

In 1965, the Legislature enacted the Evidence Code. (Stats. 1965, ch. 299, § 2, pp. 1297-1356.) In the same measure, it repealed Code of Civil Procedure section 2061. (Stats. 1965, ch. 299, § 127, p. 1366.) It plainly intended

its action to have "no effect on the giving of the [cautionary] instructions contained in" that provision, including the admonition on oral admissions. (Recommendation Proposing an Evidence Code, *supra*, 7 Cal. Law Revision Com. Rep. at p. 358.) Also in the same measure, it repealed Code of Civil Procedure section 1870. (Stats. 1965, ch. 299, § 58, p. 1360.) That provision's definition of "admission," however, was substantially recodified in section 1220 of the just-enacted Evidence Code. (Stats. 1965, ch. 299, § 2, p. 1339.)

It is, accordingly, settled that the trial court commits error when it fails to give a cautionary instruction on oral admissions, even without a request, so long as the evidence warrants. We have so held both before (*People* v. *Ford* (1964) 60 Cal.2d 772, 799 [36 Cal.Rptr. 620, 388 P.2d 892]) and after (*People* v. *Pensinger* (1991) 52 Cal.3d 1210, 1268 [278 Cal.Rptr. 640, 805 P.2d 899]) the repeal of Code of Civil Procedure section 2061.

I now turn to the case at bar. Evidence of oral admissions by defendant was received at trial. For example, there was testimony on defendant's postarrest "explanation" to the police for his decision to kill William Smith and Ann Heilperin: he stabbed Smith because he had been "uncooperative and antagonistic"; he shot Heilperin because "he felt that he had to kill another hostage in order to prove that his demands should be taken seriously." These statements were obviously "oral." They were just as obviously "admissions." The fundamental issue material to penalty is the defendant's personal moral culpability. Here, defendant sought life and the People, death. Defendant's "explanation" was adverse to his interest at trial: it magnified his blameworthiness. Manifestly, the evidence warranted a cautionary instruction on oral admissions. The trial court, however, failed to deliver such an admonition. Its omission was error.

The majority conclude to the contrary, citing asserted "differences between guilt and penalty trials." (Maj. opn., *ante*, at p. 783.) Their analysis is flawed.

Heretofore, trial courts have been required to give a cautionary instruction on oral admissions—to quote Code of Civil Procedure section 2061—"on *all* proper occasions." (Italics added.) Such an "occasion" arises in any case, whether civil or criminal, at which evidence of this kind is introduced.

Trial courts have been subjected to this obligation because of the very nature of oral admissions. "[N]o class of evidence is more subject to error or abuse." (*People* v. *Bemis*, *supra*, 33 Cal.2d at p. 399, internal quotation marks omitted.)

Any "differences" between the determinations of guilt and penalty are of no consequence for present purposes. The reason is plain. The trial of penalty is indeed a *trial*. Of that there can be no doubt. In such a proceeding, oral admissions remain problematical: the threat of "error" and "abuse" does not disappear because the question is penalty rather than guilt.

The majority assert that "Whether a particular statement is aggravating or mitigating is often open to interpretation." (Maj. opn., *ante*, at p. 783.) That may well be. But what of it? Whether a particular statement is inculpatory or exculpatory is often open to interpretation as well. In *People* v. *Vega* (1990) 220 Cal.App.3d 310 [269 Cal.Rptr. 413], the Court of Appeal expressly recognized as much. It stated that "it is not uncommon that a single statement may tend to prove guilt or innocence . . . ." (*Id.* at p. 317.) But it was "convinced a jury is capable of discerning whether [and to what extent] an extrajudicial statement is an admission, which they are instructed to view with caution, or whether [and to what extent] the statement is not an admission, to which the cautionary language does not apply." (*Id.* at p. 318.) I share that conviction. So long as the term "admission" is properly defined —for example, as simply a statement adverse to the defendant's interest at trial—the jury will be able to perform its obligations.[1]

Although the trial court erred by failing to give a cautionary instruction on oral admissions, no prejudice could have arisen. The harm that an instruction of this sort is intended to prevent, viz., the jury's crediting of an untrue or inaccurate report of words the party allegedly spoke out of court, was not threatened in this case. It was not disputed at trial that the evidence reported statements defendant had actually made, and reported those statements accurately. Hence, there is no reasonable possibility that the error contributed to the verdict. (*People* v. *Ashmus* (1991) 54 Cal.3d 932, 965 [2 Cal.Rptr.2d 112, 820 P.2d 214.)

---

[1] The majority recognize that CALJIC No. 2.71 (5th ed. 1988 bound vol.) admonishes that "Evidence of an oral admission of [a] [the] defendant should be viewed with caution." Contrary to their implication, it is immaterial that the instruction defines "admission" narrowly in terms of the question of guilt in a criminal case: "An admission is a statement made by [a] [the] defendant other than at [his] [her] trial which does not by itself acknowledge [his] [her] guilt of the crime(s) for which such defendant is on trial, but which statement tends to prove [his] [her] guilt when considered with the rest of the evidence." The quoted language, of course, was drafted specifically to cover such a question in such a case.

I note in passing that BAJI No. 2.25 (7th ed. 1992 pocket pt.) defines "admission" more generally as "A statement made by a party before trial which tends to prove or disprove any material fact in this action and which is against such party's interest is an admission." It also admonishes that "Evidence of an oral admission not made under oath should be viewed with caution."

In conclusion, having found no reversible error or other defect, I concur in the judgment.

Appellant's petition for a rehearing was denied August 13, 1992.