[Crim. No. 9137. In Bank. July 19, 1966.]

In re JOSEPH V. POE on Habeas Corpus.

Joseph V. Poe, in pro. per., and Herbert E. Selwyn, under appointment by the Supreme Court, for Petitioner.

Thomas C. Lynch, Attorney General, Albert W. Harris, Jr., Assistant Attorney General, Jennifer L. Bain and Derald E. Granberg, Deputy Attorneys General, for Respondent.

MOSK, J.—Petitioner Joseph V. Poe, inmate of the California Training Facility at Soledad, filed in propria persona a petition for habeas corpus attacking the legality of his confinement under a judgment of conviction of kidnaping for the purpose of robbery (Pen. Code, § 209) entered upon his plea of guilty.[1] The petition alleged facts which, if true, would have supported findings that a confession was obtained from him by means of mental or physical coercion imposed by the

[1]Petitioner is imprisoned pursuant to three judgments and commitments of the superior court. On September 16, 1958, petitioner pleaded guilty to a charge of forgery (Pen. Code, § 470) and was granted probation. On March 4, 1959, petitioner was convicted of escaping from an industrial farm (Pen. Code, § 4532, subd. (a)), where he had been serving time as a condition of probation; on the same date, probation was revoked and he was sentenced to state prison on the forgery conviction, the sentences for forgery and escape being declared consecutive. He was subsequently released on parole, and on August 21, 1962, pleaded guilty to a charge of kidnaping for the purpose of robbery and was again sentenced to prison. In this proceeding, petitioner attacks the validity of only the latter judgment.

police and that his plea of guilty was induced either by that coercion or by constitutionally inadequate representation of counsel. We issued an order to show cause, appointed counsel for petitioner, and appointed the Honorable Thomas P. White, retired Associate Justice of this court, as referee.

After a hearing at which both oral and documentary evidence was received, the referee found that "Petitioner's confession was not the product of mental or physical coercion by the police, but was made freely and voluntarily after Petitioner was confronted by the evidence obtained against him"; that "Petitioner's plea of guilty was not induced by mental or physical coercion on the part of the police, nor was Petitioner's plea of guilty the result of constitutionally inadequate advice of counsel"; and that the "representation afforded by Petitioner's court-appointed counsel at the trial level was not so inadequate as to amount to a denial of his constitutional right to counsel." Petitioner has excepted to these findings.

The findings of the referee, although not binding on us, merit great weight. (*In re Riddle* (1962) 57 Cal.2d 848, 853 [22 Cal.Rptr. 472, 372 P.2d 304], and cases cited.) After independent review of the record, we have concluded that the findings are fully supported and that petitioner has not sustained the burden of proof imposed upon him in this type of proceeding (see *id.* at p. 852).

On the evening of June 25, 1962, two men, armed with a pistol and a sawed-off shotgun, kidnaped the manager of a San Pedro supermarket outside his home, took him back to the store, and forced him at gunpoint to open the safe. The men escaped with the loot, releasing the manager unharmed. He immediately gave the police a description of the robbers, and an investigation began.

The first issue presented is whether petitioner's confession to the foregoing crimes was the product of mental or physical coercion by the police. According to petitioner's testimony, at 10:30 p.m. on July 26, 1962, he entered his apartment in Redondo Beach and was set upon by three armed police officers. They punched and kicked him, threw him to the floor, handcuffed him, and searched his person and the apartment. Petitioner was then taken to the Redondo Beach jail and booked on suspicion of robbery. During the admission process he heard an order being given to hold him incommunicado.

Petitioner testified that he was then interrogated by Detectives Brown and Graves for three or four hours, beginning

about midnight. After the police were informed by teletype that his parole had been revoked, they allowed him to make a telephone call to his fiancee, Mrs. Rager, whom he asked to obtain an attorney for him. He was then interrogated for several more hours, until an attorney named Borggrebe arrived to see him. Petitioner consulted with Mr. Borggrebe, but the latter declined to take the case until satisfactory financial arrangements could be made. The attorney was referred back to Mrs. Rager, and he left shortly afterwards.

Petitioner further testified that an hour or two later he was handcuffed to Jack Neathery, subsequently his codefendant, and transported to the Lakewood Police Station. There, petitioner and Neathery (hereinafter sometimes called defendants) were handcuffed to chairs and interrogated by Detectives Brown and Graves from 7 p.m. to 10 p.m. At that time petitioner was allowed to see Mrs. Rager. Escorting petitioner to the visitors' room, Detective Graves warned him that Mrs. Rager ''could be mixed up in this . . . if you don't cooperate. And that goes for your friends as well.'' In response to petitioner's inquiry the officer named five of his friends who were also being held at the Lakewood station. When petitioner saw Mrs. Rager he complained to her about the continuous interrogations and his lack of food and sleep; she informed him she could not afford to employ an attorney on his behalf. After Mrs. Rager's departure defendants were shown a footlocker, were asked if they could identify it, and then were put into a lineup with two of their friends.

Petitioner testified that the interrogations were resumed and the officers stated that Neathery's grandmother had suffered a heart attack and had been hospitalized in critical condition as a result of being informed that her grandson had been arrested for robbery and kidnaping. The officers insisted on a statement from defendants, saying, ''Tell us what we want to know''; they threatened that if defendants did not cooperate they would ''send us all to the gas chamber in San Quentin and see that our friends went to prison for life.'' Defendants were told they had until midnight to think it over, and the officers left them alone. Defendants discussed their predicament ''and about the death penalty, and that we've got this kidnaping and his grandmother, and all our friends being locked up there, and that they would be sent up to prison.'' In due course Detectives Brown and Graves returned and asked, ''What about it?'' After further discussion and under prompting by the officers, defendants confessed to both crimes.

A few hours later defendants were taken to county jail, and the next day their friends were released.

The foregoing, of course, represents petitioner's version of what transpired. It was corroborated only by the sketchy testimony of codefendant Neathery. But an entirely different picture emerged from the People's evidence. The arresting officers each testified that they were "staked out" in petitioner's apartment on the evening of July 25, 1962,[2] when petitioner entered and they placed him under arrest. He was neither punched nor kicked nor thrown to the floor. Indeed, he was cooperative and "didn't cause any disturbance or ruckus about it."[3] Because of petitioner's muscular build, the officers were unable to bring his hands together behind his back within the span of the handcuffs, and so were obliged to handcuff him in front. The officers removed a pistol from his waistband, which petitioner had pointed out to them. Petitioner then admitted he had another gun outside in his car, and the officers recovered it.

Other officers who transported petitioner to the Redondo Beach jail and were present at the booking testified they saw no bruises on him and he made no complaint of having been beaten. Petitioner's testimony that "I was never photographed in Redondo Beach" as part of the booking process was refuted by the admission into evidence of People's Exhibit 1, a standard "mug shot" of petitioner taken at the Redondo Beach jail on July 25, 1962. The photograph shows no marks of violence on petitioner. The same officers testified they heard no order to hold petitioner incommunicado; and in any event, petitioner was thereafter allowed to telephone Mrs. Rager and to consult in private with the attorney whom she sent to see him.

Petitioner's testimony that he was given nothing to eat until he confessed was refuted by the testimony of Detectives Brown and Graves that while transporting defendants to the Lakewood station they stopped and bought them hamburgers. Further, the officer who was the Lakewood jailer identified

---

[2]This date is substantiated by the booking sheet filled out later that evening at the Redondo Beach jail (People's Exh. 2). Petitioner's testimony was consistently one day off with respect to the dates these events took place.

[3]Such testimony, to the effect that petitioner was not given to physical violence, was corroborated by the testimony at the preliminary hearing of the sole victim of this kidnap-robbery, the supermarket manager:

"Q [deputy public defender] . . . At any time that night, sir, were you ever struck by anyone? A No, I wasn't. I was treated very nice.

"Q You weren't injured in any way; is that right? A Not a bit."

meal requisition records (People's Exhs. 3 and 3A) showing that petitioner and his codefendant were given breakfast on July 27, i.e., on their first morning at Lakewood and prior to the time of their confession.

Petitioner's testimony that he was subjected to prolonged periods of interrogation by Detectives Brown and Graves was contradicted by the officers themselves. They testified that the first interrogation of petitioner did not occur until shortly before noon on July 26, the day after his arrest, and lasted only half an hour.[4] Petitioner was then allowed to consult with Attorney Borggrebe. The second interrogation took place at the Lakewood station on the evening of July 26, and was concluded within one and a half to two hours. The third and final interrogation occurred about 11 a.m. on July 27 and lasted only 20 minutes. Detectives Brown and Graves denied threatening defendants during these interrogations, and specifically denied telling defendants that if they did not cooperate they would be sent to the gas chamber and their friends would be imprisoned for life. Defendants made their confession at 11:20 a.m. the same day, and the officers testified it was freely and voluntarily given.

As the referee correctly observed, there was ample evidence from which a proper motivation for the confession may be inferred. Petitioner himself testified that on the evening before the confession defendants were shown a footlocker and ''I admitted then that the foot locker was either mine or it was one quite similar to mine.'' Petitioner further testified, ''I had it in the trunk of my car.'' The footlocker contained a sawed-off shotgun, two or three handguns, a blue bag with money in it, stolen license plates, stocking masks, and other clothing. A lineup was then held, and the supermarket manager pointed out defendants as the robbers. When the referee asked Detective Graves ''what led up to the taking of the confession,'' the officer replied that ''after the show-up we brought them out individually, and we told them that they

---

[4]The officers frankly admitted that at no time during this or subsequent interrogations was petitioner informed of his rights to counsel and to remain silent. But these events took place almost two years prior to *Escobedo* v. *Illinois* (1964) 378 U.S. 478 [84 S.Ct. 1758, 12 L.Ed.2d 977], and four years preceding *Miranda* v. *Arizona* (1966) 384 U.S. 436 [86 S.Ct. 1602, 16 L.Ed.2d 694, 10 A.L.R.3d 974], and the judgment was final long before those decisions were handed down. Accordingly, the matter cannot be raised on collateral attack. (*Johnson* v. *New Jersey* (1966) 384 U.S. 719 [86 S.Ct. 1772, 16 L.Ed.2d 882]; *In re Lopez* (1965) 62 Cal.2d 368 [42 Cal.Rptr. 188, 398 P.2d 380].)

had been identified by the victim, and that there was certain other evidence against them. And at this time Mr. Neathery stated that he felt that if he could talk to the Petitioner, if we could let them talk together for a while, that something could be worked out on that.'' Defendants were allowed to converse in private, then ''said that they were ready to make a statement.'' The referee's finding that the ensuing confession was freely and voluntarily made after petitioner had been confronted by the evidence against him is thus supported by the weight of the evidence and should be adopted by this court.

The second issue presented in this proceeding is whether petitioner's plea of guilty was induced either by mental or physical coercion by the police or by constitutionally inadequate advice of counsel. Petitioner testified that he pleaded guilty under the continuing influence of the alleged threats of Detectives Brown and Graves to send him and his codefendant to the gas chamber and his friends to prison for life. Petitioner also testified that on his return to jail after the preliminary hearing he was told by Detectives Brown and Graves that ''I'd better keep my mouth shut in court''; and during a continuance on the day set for plea Detective Brown warned, ''You better not start hard-nosing or we'll arrange some all-night sessions, and maybe pick a third suspect from among your friends.''

As noted above, in contradiction to this testimony, both Detective Brown and Detective Graves denied making any threats relative to sending petitioner to the gas chamber and his friends to prison. Further, each officer specifically denied making the other threats attributed to him by petitioner, or in any way seeking to influence petitioner's decision as to plea. Here again, moreover, there was evidence from which a proper motivation for the plea of guilty may be inferred. Detective Graves testified that on the evening of July 27, i.e., after the confession, defendants ''told us that they wanted to plead guilty to this thing and get going to the joint [state prison]. They didn't want to do a lot of dead time in the County Jail when they knew they were going to the joint anyway. . . . [T]hey both mentioned that they wouldn't have any money for an attorney and that they wanted to get a Public Defender, and they asked us what they could do to speed this up so they could get going. And they asked about pleading guilty at the Preliminary Hearing. And we told them that it had been our experience that the Public Defender's office didn't like to do that.''

As the referee emphasized, the foregoing testimony as to defendants' desire to "get going" was corroborated by the events recorded at the time of plea on August 21, 1962. Defendants not only pleaded guilty to the charge of kidnaping for the purpose of robbery, but told the court through their deputy public defender that they "request immediate sentence, realizing that it would be a sentence to the State Prison. They desire to waive any right they may have to apply for probation." Sentence was imposed immediately, and defendants began serving their time. It is also significant that neither petitioner nor his codefendant chose to appeal, and that almost a year and a half elapsed before petitioner instituted this collateral attack on the judgment.

Finally, we consider whether the representation afforded by petitioner's court-appointed deputy public defenders either improperly induced him to plead guilty or otherwise deprived him of the effective assistance of counsel. ▇ [See fn. 5.] Prior to the preliminary hearing petitioner and his codefendant were interviewed by Deputy Public Defender Jack Miller.[5] Petitioner's testimony that at no time did he discuss the facts of the case with Mr. Miller was refuted by two "interview sheets" (People's Exhs. 5 and 5A) prepared by Mr. Miller during or immediately after the consultation. Mr. Miller testified that "it was my customary procedure to discuss the case with the defendants, obtain the facts from them and then put what I considered to be the most significant facts on these interview sheets." The documents here introduced, written in Mr. Miller's own hand, recited that defendants followed the manager home from the supermarket, forced him into their car at gunpoint, returned to the store, compelled him to open the safe, stole several thousand dollars, then made their escape. The interview sheets further recited that the police arrested defendants about a month later and that each made a "verbal cop-out [i.e., oral confession]."

▇ Petitioner testified that during the preliminary hearing on August 3, 1962, he asked Mr. Miller whether the confes-

[5] It appears that three or four deputy sheriffs were seated in the conference room as guards. Although the deputies testified they did not listen to defendants' conversation with Mr. Miller, one of them admitted that if he had been concentrating his attention on the discussion he probably could have overheard it. We disapprove of this practice, which jeopardizes a prisoner's right to private consultation with his attorney without the presence of law enforcement officers, even though within the confines of a jail. (See *Cornell* v. *Superior Court* (1959) 52 Cal.2d 99, 103 [338 P.2d 447, 72 A.L.R.2d 1116], and cases cited.)

sion would be valid if it had been made unwillingly, and that the latter replied, "It wouldn't be wise to question it or for you to take the stand and deny it being voluntary." In view of the nature of the proceeding, this cannot be strictured as unsound advice. ██ Moreover, Mr. Miller thereafter conducted a vigorous and effective cross-examination of the prosecuting witness on the crucial issue of identification.

Contrary to petitioner's testimony on this point, he appeared in superior court on August 17, 1962, on two occasions, not just once. At 9 a.m. on that date defendants were arraigned on an information charging them with one count of robbery and one count of kidnaping for the purpose of robbery, and the public defender was appointed to represent them. Their case was handled by Chief Deputy Public Defender Hayes Mead, who obtained a continuance until 11:45 that morning for the purpose of consulting with his clients. Petitioner testified that during the consultation they discussed neither the facts of the case nor the pleas they should make, but simply that petitioner "mentioned to Mr. Mead that Mr. Neathery was concerned about his grandmother's health."

Far more plausible is Mr. Mead's testimony that he read the transcript of the preliminary hearing, underlining significant portions; that the file also contained the interview sheets prepared by Mr. Miller and forwarded to the trial deputy in the normal course of business of the public defender's office; and that although he did not remember the exact nature of his consultation with defendants, it was his practice in such instances to review the interview sheets and to discuss with the defendants the nature of the charges, the evidence taken at the preliminary hearing, the defenses available, and the possible sentences. At 11:45 a.m. Mr. Mead appeared on defendants' behalf and obtained a further continuance to August 21 for plea.

According to petitioner's testimony, on August 21 defendants were approached in the courtroom by a new deputy public defender, Mr. Don Ellertson, who informed them he was their attorney and that it was his understanding from the district attorney's office that they would plead guilty and waive everything. Petitioner further testified he attempted to tell Mr. Ellertson they did not want to plead guilty, and that the latter replied it would be pointless and futile, in view of the confession, to do otherwise. Finally, petitioner testified he asked Mr. Ellertson whether it would make any difference if

the confession was involuntary, and that Mr. Ellertson simply walked away.

The People explained Mr. Ellertson's appearance in the case by Mr. Mead's testimony that he was going on vacation on August 20 and had therefore assigned the matter to Mr. Ellertson. Mr. Mead further testified that the original interview sheets would have been placed in Mr. Ellertson's hands and the case would have been discussed at that time.

Not surprisingly, Mr. Ellertson had little recollection of the precise sequence of events at the proceedings on petitioner's plea, which occurred more than three years prior to the reference hearing. He testified, however, that it was his usual practice to discuss the crime in advance with the defendant, the possible defenses to the charge, and how the defendant wanted to plead; if the defendant intended to plead guilty and request immediate sentencing, Mr. Ellertson would always inform him what the possible sentences could be. If the defendant expressed any doubt about pleading guilty, Mr. Ellertson would advise him to plead not guilty. And if the defendant sought to question him concerning the effect of the possible involuntariness of a confession, he would not simply walk away but would discuss the matter with him.

Once again the testimony of the People's witnesses finds corroboration in the events recorded at the time of the plea.[6]

---

[6] "THE COURT: People versus Jack Hayes Neathery, Jr. and Joseph Vincent Poe.

"MR. ELLERTSON: The Defendants are ready to plead.

"MR. KIRSCHKE [deputy district attorney]: Mr. Neathery, to the charges set forth against you in Count I of the Information, how do you plead, guilty or not guilty?

"DEFENDANT NEATHERY: Not guilty.

"MR. KIRSCHKE: To the charge in Count II?

"DEFENDANT NEATHERY: Guilty.

"MR. KIRSCHKE: Mr. Poe, to the charge in Count I, how do you plead, guilty or not guilty?

"DEFENDANT POE: Not guilty.

"MR. KIRSCHKE: To the charge in Count II?

"DEFENDANT POE: Guilty.

"MR. ELLERTSON: Your Honor, Defendants request immediate sentence, realizing that it would be a sentence to the State Prison. They desire to waive any right they may have to apply for probation.

"THE COURT: Is that correct, gentlemen?

"DEFENDANT NEATHERY: Yes, sir.

"DEFENDANT POE: That is correct.

"THE COURT. All right. What are you intending to do with the first count?

"MR. KIRSCHKE: Well, we will wait, after the sentence I assumed it will be dismissed.

"THE COURT: All right. Well, it is the judgment of the Court then, in view of the waiver—and you waive arraignment for judgment?

The transcript discloses that petitioner, as did his codefendant, personally entered pleas of not guilty to the charge of robbery and guilty to the charge of kidnaping for the purpose of robbery, and that the first count was thereafter dismissed "in the interest of justice." In the light of his testimony that Mr. Ellertson told defendants they "would plead guilty," petitioner is hard put to explain why he and Neathery pleaded not guilty to the robbery count. When counsel for the People inquired at the reference hearing whether petitioner had been asked for a plea on that count, petitioner replied evasively that he "really couldn't say." In spite of petitioner's detailed recall of all the events leading to his plea of guilty, he repeatedly claimed at the reference hearing that he had "no recollection" of pleading not guilty to the robbery charge or of voicing his assent in open court to each of the waivers proposed by Mr. Ellertson to expedite the disposition of the case. As the referee correctly concluded, petitioner's testimony that prior to entering the pleas he had received no advice on the subject from his counsel "challenges credulity and does violence to reason."[7]

The deputy public defenders who represented petitioner in the superior court were well aware of the strength of the case against him. They had the benefit of the interview sheets prepared by Mr. Miller, which reflected defendants' acknowledged complicity in the crimes charged; they also had the benefit of the transcript of the preliminary hearing, which contained the identification testimony of the eyewitness-victim and the account of defendants' confession to the police. Nevertheless, Deputy Public Defender Ellertson secured a dismissal of one of the two counts charged. In the light of the

---

"MR. ELLERTSON: Yes, we waive arraignment for judgment, there is no legal cause why judgment should not now be pronounced. And we waive time, Your Honor.

"THE COURT: All right."

The court thereupon sentenced defendants to prison for the term prescribed by law, and the robbery count was dismissed "in the interest of justice."

[7]Moreover, we are not dealing here with a novice unfamiliar with the administration of criminal justice. Contrary to the averment in the petition for habeas corpus that "At the time of Petitioner's conviction he had no knowledge of his legal and constitutional rights," the record reveals many court appearances by petitioner on prior criminal charges dating back to 1950 when he was 15 years old, in which he pleaded either not guilty or guilty according to the circumstances. At least in the two most recent of these cases (see fn. 1 *ante*) he was represented by counsel with whom he discussed the disposition of the proceedings.

evidence in the record this disposition of the case was as favorable as petitioner could reasonably have sought, and no denial of effective assistance of counsel is shown.

For the reasons given, the referee's findings upholding the voluntariness of petitioner's plea of guilty and the adequacy of his counsel's representation are supported by the weight of the evidence and are adopted by this court.

The order to show cause is discharged and the petition for writ of habeas corpus is denied.

Traynor, C. J., McComb, J., Peters, J., Tobriner, J., Peek, J., and Burke, J., concurred.