[No. D034014. Fourth Dist., Div. One. Apr. 11, 2000.]

LARRY SMALL, as Warden, etc., Petitioner, v.
THE SUPERIOR COURT OF IMPERIAL COUNTY, Respondent;
JOSEPH BARRETT, Real Party in Interest.

**COUNSEL**

Bill Lockyer, Attorney General, David P. Druliner, Chief Assistant Attorney General, Paul D. Gifford, Assistant Attorney General, Darrell L. Lepkowsky and Barbara C. Spiegel, Deputy Attorneys General, for Petitioner.

No appearance for Respondent.

Eric Beaudikofer and Edward C. Sada for Real Party in Interest.

**OPINION**

**HALLER, Acting P. J.**—Larry Small, Warden of Calipatria State Prison, petitions for writ of mandate and/or prohibition after the court issued two orders that the warden claims unduly interfere with his authority and duty to safely operate a maximum security facility. The first order requires Small to alter an attorney visiting room specially constructed for inmate Joseph Barrett, who is charged with the capital offense of murder while serving a life sentence for a previous murder and has the prison system's highest security classification. The second order requires Barrett's hands to be unrestrained at pretrial proceedings.

We stayed the proceedings, issued an order to show cause and now grant the petition.

## Procedural and Factual Background

Barrett is charged with the murder of his cellmate while housed at Calipatria State Prison (Calipatria). Barrett is classified for confinement purposes to a "Security Housing Unit," the most secure housing placement within the California Department of Corrections. Security Housing Unit is an extended term placement designated for an inmate whose conduct endangers the safety of others or the security of the institution. (Cal. Code Regs., tit. 15, § 3341.5, subd. (c).)

Although Calipatria is a level IV maximum security prison, it does not have a Security Housing Unit. Barrett is being housed in the prison's "Administrative Segregation Unit," the institution's most secure housing unit, while awaiting trial for the murder of his cellmate.[1] Administrative Segregation Unit is a placement for an inmate who presents an immediate threat to the safety of the inmate or others, endangers institution security or jeopardizes the integrity of an investigation of alleged serious misconduct or criminal activity. (Cal. Code Regs., tit. 15, § 3335.)

Under statewide regulations, inmates assigned to Security Housing Unit are prohibited from physical contact with visitors. (Cal. Code Regs., tit. 15, § 3343, subd. (f).) Calipatria operational rules provide inmates in the prison's Administrative Segregation Unit can have only noncontact visits. (Calipatria State Prison Operational Program Guide, Administrative Segregation Unit; Calipatria State Prison Operational Procedure 3008, Inmate Visiting.) A noncontact visit is a visit between an inmate and visitor that is conducted without any physical contact and with a physical barrier between them.

On May 13, 1998, Eric Beaudikofer, counsel for Barrett, procured an ex parte order allowing him to have contact visits with Barrett.[2] Approximately 10 months later, Dean Blanton, the prison's custody captain, learned that Barrett was having contact visits with his attorneys and staff, which was contrary to the prison's visitation rules for inmates with Barrett's security classification. On March 5, 1999, Blanton discontinued the contact visits between Barrett and his counsel, and Warden Small subsequently moved to vacate the orders allowing the contact visits.

After Blanton's discovery, Barrett's visits with counsel took place in the general visiting area for Administrative Segregation Unit inmates, a room

---

[1]Were it not for the pending murder case, Barrett would have been transferred to a prison with a Security Housing Unit. At the time of these proceedings, only two state prisons, Pelican Bay State Prison and Corcoran State Prison, had a Security Housing Unit.

[2]On May 29, 1998, the court issued a second ex parte order allowing cocounsel Edward C. Sada to have contact visits with Barrett.

where inmates and visitors, separated by a glass partition, converse over a telephone. Prison officers are stationed in the area, and prison vendors are given access to the area during counsel interviews. Correctional officers, vendors and visitors of other inmates often are within hearing distance of counsel.[3] Barrett's counsel also complained that Barrett could speak to only one person at a time over the telephone and papers could not be readily viewed or exchanged.

At the first evidentiary hearing, counsel objected to Barrett being shackled during the proceedings, citing Barrett's inability to write during the hearings with his hands handcuffed to a waist chain. After a noticed motion hearing, the court ordered prison officials to put restraints on Barrett that would allow him to write and take notes. Thereafter, the prison authorities secured Barrett's right hand with a 10-inch extension chain to the waist chain while his left hand remained handcuffed to the waist chain during courtroom appearances.

At the second hearing, which was held at the prison to enable the court to observe the visiting areas, Small's counsel informed the court that the warden was considering constructing a wall in one of the visiting areas to provide a completely enclosed room for Barrett to visit with his counsel. The room would be divided by Plexiglas and have several voice ports or holes to allow more than two persons to engage in a discussion at one time as well as ledges for counsel and Barrett to place papers.

By the time of the fifth hearing, the special visiting area for Barrett had been completed: a room designed to enforce the no-contact rule but provide for confidential meetings with counsel. Barrett enters the back half of the room through a door that is then closed and locked. Barrett sits on one side of the Plexiglas divider with voice ports, facing his attorneys, who sit on the other side of the Plexiglas in a completely enclosed area. There is a ledge on each side of the Plexiglas for papers. To effectuate the sharing of documents, there is a locked slot in the door which separates Barrett's half of the area from counsel's half. To exchange documents, counsel must contact a correctional officer, who checks the papers for contraband and then passes them through the slot to Barrett.

Warden Small testified one of his major security concerns at the prison is the possibility that an attorney—either knowingly or unwittingly—passes contraband to an inmate with a propensity for violence. Small said items

[3] In one instance, counsel's interview of Barrett took place while a private investigator representing a prison informant, who is identified as a witness against Barrett, was sitting in the next visiting booth, separated only by a partial wall.

such as a paper clip or a staple that appear harmless can be passed during visits and later used by an inmate to escape or to manufacture a weapon. Recently, an inmate had opened his leg irons with a staple. Paper clips have been used to cut 14-gauge steel or aluminum to make weapons. Small said the policy of having noncontact visits for inmates with a demonstrated propensity for violence minimizes the danger that contraband will be passed back and forth and used in prison assaults, hostage-taking or escapes.

Small testified that altering the new visiting room by replacing the glass partition with wire mesh and a document pass-through underneath the mesh would be tantamount to instituting contact visits. Small opined allowing contact visits poses an unreasonable security risk, violates prison operating procedures and creates a significant threat.

The Department of Corrections also presented evidence of Barrett's extensive history of nonconforming conduct and violence in prison. In the previous 10 years, Barrett committed 64 rule violations, 54 of which were classified as serious. These included stabbing or slashing assaults on fellow inmates, battery with a weapon on another inmate, battery on an inmate resulting in serious bodily injury, and the manufacture and possession of dangerous weapons.

Barrett's propensity and skill at manufacturing weapons and hiding them also were detailed. For example, in May 1995, a metal detector in the prison yard showed Barrett had metal inserted in his anal cavity. After being X-rayed in the prison infirmary, Barrett slipped off his handcuffs, removed the metal from himself and tried unsuccessfully to flush it down a toilet. The metal was two and three-fourths inches long. The width varied from one-half inch to one and one-half inches.

In March 1996, officers found Barrett with a two-and-three-eighths-inch weapon made out of a black state-issued comb with two pieces of razor blades—three-fourths of an inch long—melted into it. The weapon was wrapped with the thread from a state-issued sock; this comprised the handle. Barrett, who was in the prison yard, had been carrying the weapon between his penis and testicles, in anticipation of a fight with another inmate who was similarly armed.

On February 21, 1999, prison officials recovered seven inmate-manufactured weapons from the walls of Barrett's cell, including a stabbing weapon fashioned from a piece of metal cut from Barrett's cell desk; the weapon, which was tapered to a sharp point at one end, was five inches long and three-fourths of an inch wide. The other weapons were constructed from

razor blades, a cigarette lighter, metal from a set of tweezers, a fence tie, a nail with the head cut off, two sewing needles and thread.

Barrett and his counsel testified that private contact visits are necessary to protect the confidentiality of privileged lawyer-client communications. After the termination of the contact visits, Barrett refused to talk to his counsel on the prison telephone for fear prison personnel could monitor conversations.

Barrett's counsel also testified that the thorough search procedures they underwent prior to each contact visit eliminated the danger of contraband being passed on. They also pointed out that there were no incidents of impropriety by Barrett or counsel during the 10 months of contact visits.

As to the specially constructed interview room, Barrett's counsel claimed it was too small to allow the defense to bring in all the necessary experts for interviews and demonstrations. The room also was inadequately sound-proofed. Counsel also complained they could not view Barrett's facial expressions when he talked through the metal voice ports. As to exchanging documents through the locked mail slot, counsel said the procedure was cumbersome and time-consuming, and stifled the exchange of information within the limited time periods allowed for visits.

As to the shackling issue, Warden Small testified his ability to ensure an inmate such as Barrett is not carrying a prison-manufactured weapon to court is restricted even though he sends at least six officers—two more than normally used—to escort Barrett to court. The prison is not legally permitted to X-ray inmates before transporting them to court. Routine body cavity searches also are not permitted. Further, inmates going to the Imperial County courthouse do not go through a metal detector. Small opined un-shackling Barrett in court poses an extreme risk and a threat to the people in the courtroom and the public at large.

The defense pointed out that Barrett had comported himself appropriately at all court proceedings, and there were no incidents—either at the prison or during transportation—that showed Barrett presented a danger of becoming disruptive or assaultive, or of escaping.

On August 9, the court denied Barrett's request for reinstatement of contact visits. However, the court ordered Small to modify the specially constructed visiting area to increase counsel's ability to confer with Barrett. Under the court's order, the warden must remove the glass between Barrett and counsel, replace it with wire mesh, construct a pass-through at the bottom of the wire mesh for exchange of papers, and further soundproof the

room. The court also ordered that Barrett's hands and arms not be restrained during pretrial proceedings; however, the ankle "bracelets" are to remain.

DISCUSSION

## I. *Modification of Visiting Area*

Warden Small contends the trial court's order to replace the glass partition with wire mesh and to install a slot for the direct exchange of documents in the visiting area constructed for Barrett was an abuse of discretion.[4] As explained below, we agree.

Preliminarily, we note the general visiting area for Administrative Segregation Unit inmates where communication between counsel and inmate is conducted over a telephone and in a room where correctional officers and other individuals are present is *not* at issue. As the trial court observed after its first tour of the prison, this visiting area did not provide for confidential communications between counsel and inmate as conversations could be overheard by others. Subsequently, the warden had a visiting area for Barrett constructed to provide greater confidentiality of attorney-client communications. We consider the court's order in the context of this specially constructed visiting area.

### *Trial Court's Ruling*

The trial court reiterated its earlier voiced complaints that the regular visiting area for Administrative Segregation Unit inmates lacked privacy and was "totally unacceptable" and noted the prison had "jumped the gun" and constructed an enclosed visiting room for Barrett. As to the specially constructed visiting room, the court found it "for the most part, to be all right," with the "major . . . problems hav[ing] been alleviated." Significantly, the court found Barrett and counsel could engage in private conversations in the newly built room. The court also observed that the room would not adversely affect the ability of counsel to adequately represent Barrett or Barrett's right to receive a fair trial.

Nonetheless, the court ordered Warden Small to replace the glass partition with a wire mesh screen and install a mail slot at the bottom of the screen.

In explaining why it was ordering the glass be replaced with wire mesh, the court said the conversations through the voice ports were distorted and

---

[4]Small does not challenge the portion of the order that requires additional soundproofing. Accordingly, we need not address this issue beyond sustaining that portion of the order.

had an echo and added: ". . . I just don't find that [the voice ports are] needed when you can have a wire mesh type of a barrier. And there you can actually see the person. You can see them in the flesh. You are not looking at him through any plastic or glass partition. You are not speaking to a porthole. You are speaking to him right there in the flesh. And I think the wire mesh works really well, and I don't see any reason why, when we balance these things, why not simply install the wire mesh instead of this glass partition."

As to why it ordered a mail slot, the court first said the locked slot in the door for exchange of documents did not have anything to do with security and then added: "Perhaps, it might have something to do with contraband but, counsel, I'm not concerned with contraband in this case. Counsel and their investigators are going to be the only ones inside that room with the Defendant. I've known these two counsel, attorneys for the Defendant, for many years and I have no doubt whatsoever that there's not going to be any problem with contraband in that room. I rather that they be able to pass papers back and forth."[5]

*Legal Principles*

█ It is indisputable that Barrett has the right to effective assistance of counsel, which includes the right to confer with counsel in absolute privacy. (See *Barber v. Municipal Court* (1979) 24 Cal.3d 742, 751 [157 Cal.Rptr. 658, 598 P.2d 818]; *In re Poe* (1966) 65 Cal.2d 25, 32, fn. 5 [51 Cal.Rptr. 896, 415 P.2d 784]; *In re Snyder* (1923) 62 Cal.App. 697, 699, 702 [217 P. 777].) As the Court of Appeal observed in *People v. Torres* (1990) 218 Cal.App.3d 700, 705 [267 Cal.Rptr. 213]: "Adequate legal representation requires a full disclosure of the facts to counsel. Privacy is necessary to ensure that the defendant may safely reveal all the facts of his case to his attorney. Thus, an inmate must be afforded a reasonable opportunity to privately consult with his attorney without having other persons present. [Citation.]"

However, prison authorities can implement reasonable restrictions on visits between an inmate and his or her attorney if necessary for prison security. (*People v. Torres, supra*, 218 Cal.App.3d at p. 706; *Department of Corrections v. Superior Court* (1982) 131 Cal.App.3d 245, 253-255 [182 Cal.Rptr. 294].)

█ In cases involving security measures affecting prisoner rights, the starting point is Penal Code section 2600, which provides in relevant part:

[5]The court also explained it would not reinstitute full-fledged contact visits between Barrett and counsel because Barrett was a security risk, as shown by his propensity for violence and possession of weapons inside the prison.

"A person sentenced to imprisonment in a state prison may during that period of confinement be deprived of such rights, and only such rights, as is reasonably related to legitimate penological interests."

Indeed, the principle that restriction of an inmate's constitutional rights may not extend beyond that which is reasonably necessary for prison security concerns has been embraced repeatedly by the nation's highest court. (See *Pell v. Procunier* (1974) 417 U.S. 817 [94 S.Ct. 2800, 41 L.Ed. 2d 495]; *Bell v. Wolfish* (1979) 441 U.S. 520 [99 S.Ct. 1861, 60 L.Ed.2d 447]; *Block v. Rutherford* (1984) 468 U.S. 576 [104 S.Ct. 3227, 82 L.Ed.2d 438]; *Turner v. Safley* (1987) 482 U.S. 78 [107 S.Ct. 2254, 96 L.Ed.2d 64].)

For example, in *Turner v. Safley, supra,* 482 U.S. at page 89 [107 S.Ct. at page 2261], the United States Supreme Court held: "[W]hen a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." The high court went on: "In our view, such a standard is necessary if 'prison administrators . . . , and not the courts, [are] to make the difficult judgments concerning institutional operations. [Citation.]" (*Ibid.*)

Under California law, the warden of a state prison has the authority to supervise, manage and control the institution and its inmates. (See Pen. Code, §§ 2079, 5054.) California Code of Regulations, title 15, section 3173, subdivision (h) provides that the degree of physical contact permitted between inmates and visitors will vary among the institutions depending upon the institution's overall security requirements, the custody classification and assignment of individual inmates, and upon the degree of risk that visiting will present to the safety of persons and for the introduction of dangerous contraband.

In determining whether a prison restriction is reasonable, relevant factors are: (1) whether there is a " 'valid, rational connection' between the prison [restriction] and the legitimate governmental interest put forward to justify it"; (2) whether there are alternative means of exercising the right; (3) how the accommodation of the asserted right will impact guards, other inmates and the allocation of prison resources; and (4) whether the restriction is an " 'exaggerated response' " to prison concerns. (*Turner v. Safley, supra,* 482 U.S. at pp. 89-91 [107 S.Ct. at pp. 2261-2263].)

*Analysis*

 Applying the *Turner* analysis to the visiting room specially constructed for Barrett, we find the first *Turner* criterion was met. The warden's

objective in having a glass partition separating Barrett from counsel and a secure mechanism for exchange of papers is to prevent the introduction of contraband and thereby to protect the inmates, prison staff and the general public from the possibility of assault, hostage-taking and escape. Maintenance of prison security undoubtedly is a legitimate government interest. The glass partition and locked mail device are rationally related to the government interest of maintaining prison security because they reduce the possibility contraband will be brought into the prison. There was more than substantial evidence that Barrett—with his propensity for violence, hiding contraband and manufacturing weapons—presents a major security risk to the prison, and it is essential that he not have access to any contraband.

The second *Turner* criterion—whether alternative means of exercising the right remain open to the inmate—also is met. The specially constructed area provides for confidential, private communications between Barrett and counsel, and, at the same time, supplies the prison with the necessary security precautions.

Regarding the third *Turner* factor—the impact on guards, other inmates and allocation of prison resources—the prison, by constructing the visiting room on its own initiative, indicated it had no problem accepting any negative impact on the guards or the institution. As to this proceeding, we need not concern ourselves with the impact on other inmates; however, we note the room presumably could be used for attorney-client visits for other inmates with similar high security classifications.

Finally, we consider whether the specially constructed room was an " 'exaggerated response' to prison concerns"—the fourth *Turner* criterion. As *Turner* explained: "[T]he existence of obvious, easy alternatives may be evidence that the regulation is not reasonable, but is an 'exaggerated response' to prison concerns." (*Turner v. Safley, supra*, 482 U.S. at p. 90 [107 S.Ct. at p. 2262].) This criterion, however, is not the same as a least restrictive alternative test. (*Ibid.*) "[P]rison officials do not have to set up and then shoot down every conceivable alternative method of accommodating the claimant's constitutional complaint." (*Id.* at pp. 90-91 [107 S.Ct. at p. 2262].)

We find the glass partition and secured mail mechanism were not an " 'exaggerated response' to prison concerns." The evidence showed that ordinarily harmless items such as paper clips or staples can be passed during visits, and these items can be used to escape or to manufacture a weapon. For example, an inmate had recently used a staple to open his leg irons. Inmates have also been known to cut 14-gauge steel with a paper clip to

make weapons. Replacing the glass partition with wire mesh and a pass-through underneath substantially increases the risk of Barrett gaining access to items such as a paper clip or a staple. Moreover, Barrett has a documented history of manufacturing weapons inside the prison.

 "[W]hen prison officials are able to demonstrate that they have rejected a less restrictive alternative because of reasonably founded fears that it will lead to greater harm, they succeed in demonstrating that the alternative they in fact selected was not an 'exaggerated response' under *Turner*." (*Thornburgh v. Abbott* (1989) 490 U.S. 401, 419 [109 S.Ct. 1874, 1884-1885, 104 L.Ed.2d 459].) That is the case here. Warden Small's fear that if given the opportunity Barrett, with his history, would make weapons out of seemingly innocuous contraband that may unwittingly be passed through a screen or an unsecured slot was not unreasonable or an exaggerated response.

In short, the specially constructed visiting area for Barrett, with the glass partition and voice ports and the secured mail mechanism in the door, was a reasonable penological restriction on Barrett's access to his attorneys.[6]

It is important to recognize that although the law jealously guards the right to effective assistance of counsel and the concomitant right to confidential communications with counsel, the law does not give prison inmates the absolute right to have contact visits with their counsel. What the law does require is that the inmate's meeting with his or her attorney be private.[7] This legal requirement of privacy was met by the newly constructed visiting area for Barrett—as the trial court found.

By ordering refinements—the wire mesh screen and mail slot—to a lawful visiting room, the court was attempting to step into the shoes of the warden, who is the one with the legal authority to supervise, manage and control the prison. (Pen. Code, §§ 2079, 5054.) The court overstepped its bounds and abused its discretion in doing so.

This point repeatedly has been underscored by the United States Supreme Court in stressing the need for deference by the courts in this area. (See, e.g.,

---

[6]It also was in keeping with prison regulations that prohibit Security Housing Unit inmates from having contact visits. (Cal. Code Regs., tit. 15, § 3343, subd. (f).)

[7]We note the regulations of the Department of Corrections acknowledge this principle: "Inmates have a constitutional right of access to an attorney. It is the policy of this department to facilitate both correspondence and personal consultation for this purpose." (Cal. Code Regs., tit. 15, § 3175.) Further, the regulations provide that attorney visitation includes the right to transfer papers, subject to reasonable inspection by the department in a manner that preserves confidentiality. (Cal. Code Regs., tit. 15, § 3175, subds. (j) & (l).)

*Turner v. Safley, supra,* 482 U.S. at pp. 84-85 [107 S.Ct. at pp. 2259-2260]; *Bell v. Wolfish, supra,* 441 U.S. at pp. 545-548 [99 S.Ct. at pp. 1877-1879].) ▮ As the high court stated in *Bell v. Wolfish, supra,* 441 U.S. at pages 547-54 [99 S.Ct. at pages 1877-1879]:

"Prison officials must be free to take appropriate action to ensure the safety of inmates and corrections personnel and to prevent escape or unauthorized entry. Accordingly, we have held that even when an institutional restriction infringes a specific constitutional guarantee . . . the practice must be evaluated in the light of the central objective of prison administration, safeguarding institutional security. [Citations.]

". . . Prison administrators therefore should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security. [Citations.] 'Such considerations are peculiarly within the province and professional expertise of corrections officials, and, in the absence of substantial evidence in the record to indicate that the officials have exaggerated their response to these considerations, courts should ordinarily defer to their expert judgment in such matters.' [Citation.] We further observe that, on occasion, prison administrators may be 'experts' only by Act of Congress or of a state legislature. But judicial deference is accorded not merely because the administrator ordinarily will, as a matter of fact in a particular case, have a better grasp of his domain than the reviewing judge, but also because the operation of our correctional facilities is peculiarly the province of the Legislative and Executive Branches of our Government, not the Judicial. [Citations.]" *(Bell v. Wolfish, supra,* 441 U.S. at pp. 547-548 [99 S.Ct. at pp. 1878-1879], fn. omitted.)

▮ A trial court's discretion cannot be arbitrary but rather must be "guided and controlled by fixed legal principles, to be exercised in conformity with the spirit of the law, and in a manner to subserve and not to impede or defeat the ends of substantial justice." *(People v. Warner* (1978) 20 Cal.3d 678, 683 [143 Cal.Rptr. 885, 574 P.2d 1237].) "[A]ll exercises of legal discretion must be grounded in reasoned judgment and guided by legal principles and policies appropriate to the particular matter at issue." *(People v. Russel* (1968) 69 Cal.2d 187, 195 [70 Cal.Rptr. 210, 443 P.2d 794].)

▮ We do not lightly conclude that an abuse of discretion has occurred here. The trial court obviously devoted a great deal of time to the matter and gave much thought to its decision. However, the court abused its discretion by imposing its personal view that a wire mesh screen is better than a glass partition for purposes of the attorney-inmate interviews in light of the

warden's assessment that the screen presents a security risk. So too with respect to the mail slot. The court abused its discretion by ordering the unsecured pass-through because the court was convinced—based on its personal knowledge of the integrity of the two defense counsel—that passage of contraband would not take place.

## II. Shackling

Warden Small contends the court abused its discretion in ordering Barrett's hands to be completely unrestrained during all pretrial proceedings. As explained below, we agree.

### Trial Court's Ruling

In ordering the removal of restraints on Barrett's arms and hands, the trial court said prison officials had not made a sufficient showing of "nonconforming conduct that one will expect will occur in the courtroom or during the judicial process," as opposed to nonconforming conduct at the prison. The court explained the violent incidents relied upon by Small were committed against fellow inmates in the prison setting and not against correctional officers or deputy sheriffs. The court also noted that there had not been any misconduct or threats of misconduct in the courtroom by Barrett.

According to its understanding of the law, the court said shackles cannot be ordered "[u]nless I found that there was substantial evidence of nonconforming conduct that I expect would cause some kind of a security problem here in the courtroom during the proceedings, during the judicial process, which there hasn't been any."

### Legal Principles

The use of shackles in court has long been met with disapproval. (See *People v. Harrington* (1871) 42 Cal. 165.)[8] The most significant reason is the inherent risk that "the shackling of a criminal defendant will [cause] prejudice . . . in the minds of the jurors. When a defendant is charged with any crime, and particularly if he is accused of a violent crime, his appearance before the jury in shackles is likely to lead the jurors to infer that he is a violent person disposed to commit crimes of the type alleged." (*People v. Duran* (1976) 16 Cal.3d 282, 290 [127 Cal.Rptr. 618, 545 P.2d 1322, 90 A.L.R.3d 1].) Shackling also is not condoned because it may impair a defendant's ability to participate in his or her defense. (*Id.* at pp. 290-291.)

---

[8]See also Penal Code section 688: "No person charged with a public offense may be subjected, before conviction, to any more restraint than is necessary for his detention to answer the charge."

"[A] defendant cannot be subjected to physical restraints of any kind in the courtroom while in the jury's presence, unless there is a showing of a manifest need for such restraints." (*People v. Duran, supra*, 16 Cal.3d at pp. 290-291, fn. omitted.) Manifest need exists "only upon a showing of unruliness, an announced intention to escape, or '[e]vidence of any nonconforming conduct or planned nonconforming conduct which disrupts or would disrupt the judicial process if unrestrained . . . .' " (*People v. Cox* (1991) 53 Cal.3d 618, 651 [280 Cal.Rptr. 692, 809 P.2d 351].)

A manifest need showing does not have to be based on the conduct of the prisoner at the time of trial. (*People v. Livaditis* (1992) 2 Cal.4th 759, 774 [9 Cal.Rptr.2d 72, 831 P.2d 297].) Nor does it require a previous attempt by the defendant to disrupt courtroom proceedings or to escape from custody. (*People v. Hawkins* (1995) 10 Cal.4th 920, 944 [42 Cal.Rptr.2d 636, 897 P.2d 574].)

■ Restrictions on the use of shackling also apply at preliminary hearings absent some showing of necessity. (*People v. Fierro* (1991) 1 Cal.4th 173, 220 [3 Cal.Rptr.2d 426, 821 P.2d 1302].) "[T]he dangers of unwarranted shackling at the preliminary hearing are . . . not as substantial as those presented during trial. Therefore, a lesser showing than that required at trial is appropriate." (*Ibid.*)

*Analysis*

■ At the outset, we want to emphasize the issue of restraints in the courtroom in this case arises in the context of pretrial proceedings and the views we express should not be interpreted to have application to the issue of courtroom restraints during a trial. Furthermore, our conclusions are based in large part on Warden Small's custodial responsibility for Barrett from the time he leaves the prison, including his time in the courtroom, through the time he is transported back to prison. With those preliminary remarks in mind, we proceed to our analysis.

Contrary to the trial court's finding, we find Warden Small made a sufficient showing to justify shackling Barrett during pretrial proceedings, including evidentiary hearings. Barrett's documented history of violence while in custody and his ability to craft everyday items into dangerous weapons and hide them in his body cavities, coupled with the prohibition against X-raying him and conducting body cavity searches before he comes to court, established that Barrett presents an extreme security risk, not only in the prison setting but in a courtroom as well.

The court misconstrued the necessary showing required to permit shackles at pretrial hearings. The court's belief that the law required evidence of a

certain type of nonconforming conduct was mistaken. The fact that Barrett has regularly attacked fellow inmates—not prison guards—does *not* preclude his nonconforming conduct of violent acts and arming himself while in prison from being conduct that would " 'disrupt the judicial process if unrestrained . . . .' " (*People v. Cox, supra*, 53 Cal.3d at p. 651.) In concluding that it did, the trial court erred.

As the Supreme Court observed in *People v. Hawkins, supra*, 10 Cal.4th at page 944, justifications for shackling in court are not restricted to a defendant's previous attempts to disrupt courtroom proceedings or to escape. "We have never placed such preconditions on the trial court's exercise of its discretion." (*Ibid.*) However, as we read the trial court's explanation of its ruling, the court believed its hands were tied because Barrett so far had not attacked a law enforcement officer while in custody, acted inappropriately in court, or tried to escape. But as *People v. Livaditis, supra*, 2 Cal.4th at page 774 teaches: "It is not necessary that the restraint be based on the conduct of the defendant at the time of trial."

Given Barrett's extensive violent history and ability to obtain or make weapons and hide them, he presented an extreme security risk not only in the prison setting but in the courtroom as well. The trial court implicitly acknowledged this by requiring the ankle bracelets to remain.

Also, since *People v. Fierro, supra*, 1 Cal.4th at page 220 held restrictions on shackling apply to preliminary hearings, for purposes of this writ proceeding, we will assume, without deciding, that shackling restrictions also apply to other pretrial evidentiary hearings. It follows under *Fierro* that a lesser showing would be required to justify shackling at other pretrial evidentiary hearings than required for shackling at trial because the danger of prejudice is removed if there is no jury. (*Ibid.*) Although the *Fierro* court was concerned that civilian witnesses at a preliminary hearing could be influenced by seeing the defendant in shackles (*ibid.*), that risk presumably does not exist in the type of pretrial evidentiary hearings that have or will be held in this case.

Finally, we note the court's earlier order that resulted in Barrett's right hand being secured with a 10-inch extension chain to the waist chain to enable him to take notes satisfied another concern of the *Fierro* court— namely, that shackling could impair the ability of the defendant to communicate effectively with counsel. (*People v. Fierro, supra*, 1 Cal.4th at p. 220.) Our reading of the record does not disclose any rational reason to alter this arrangement, which addressed the warden's legitimate concerns for security

in the courtroom. We conclude it was an abuse of discretion to order Barrett's arms and hands to be unrestrained for the remainder of pretrial evidentiary hearings.[9]

### DISPOSITION

Let a writ issue directing the superior court to vacate its orders of August 9, 1999, and to enter new orders consistent with this opinion. The stay will be vacated when this opinion is final as to this court.

McDonald, J., and O'Rourke, J., concurred.

---

[9]As indicated above, we do not address what appropriate security measures may be taken at trial. An entirely different set of factors comes into play at a jury trial than during pretrial evidentiary hearings. The trial court should revisit this issue at the appropriate time.