Filed 7/26/13  P. v. Rideaux CA5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>DYONDRE RIDEAUX,<br><br>    Defendant and Appellant. | F063216<br><br>(Super. Ct. No. F09901856)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Fresno County.  Wayne R. Ellison, Judge.

Susan K. Shaler, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Julie A. Hokans and Clara M. Levers, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

Appellant Dyondre Rideaux was charged by the Fresno County District Attorney with the crimes of (1) continuous sexual abuse of a child under the age of 14 years from January 2, 2008 through March 21, 2009 (Pen. Code, § 288.5, count 1),[1] (2) committing a lewd act on a child on or about January 1, 2008 (§ 288, subd. (a), count 2), and (3) committing a lewd act on a child on or about March 23, 2009 (§ 288, subd. (a), count 3). At trial, the jury heard substantial evidence that appellant had repeatedly sexually molested Natasha. Natasha was 10 years old at the time the incidents began and appellant was 39 years old. Appellant took the stand on his own behalf and claimed that Natasha was the sexual aggressor and he was merely a passive victim, adding that he believed Natasha's mother had been prostituting Natasha. The jury found appellant guilty as charged on all counts, and the trial court thereafter sentenced him to a total of 20 years in state prison. Appellant appeals on the grounds that the trial court erred in excluding certain evidence and inadequately instructing the jury on the time parameters of the three counts. We find both arguments unavailing and affirm the judgment.

## FACTS AND PROCEDURAL HISTORY

A. Prosecution's Case

In October 2007, appellant began residing at the home of Natasha's mother, whom we shall refer to as Diana D. At that time, Diana D. had two daughters living at home with her, nine-year-old Natasha and 16-year-old M. Diana D. also had two sons, Robin and Damien, from a prior relationship with appellant's father. When appellant moved in, the following people lived in Diana D.'s house: Diana D., her boyfriend Clarence (not appellant's father), Natasha, M., and Damien (appellant's half-brother). Clarence and Damien moved out sometime in 2008. Diana D. permitted appellant to sleep on the floor in Natasha's bedroom for almost a year. Sometimes Natasha would sleep with Diana D.

---

[1]   Unless otherwise indicated, all further statutory references are to the Penal Code.

Less frequently, appellant would enter Diana D.'s bedroom and sleep in Diana D.'s bed with both Diana D. and Natasha.

*The First Act of Molestation—January 1, 2008*

On January 1, 2008, Diana D. looked through Natasha's door early in the morning and saw appellant and Natasha on the bed together in Natasha's room. Appellant was lying down under the covers and Natasha was sitting near his feet, naked from the waist down. Diana D. quickly summoned Natasha into the bathroom and asked her what was going on. Natasha said that she "wanted to see how it felt." She also stated that appellant "put his mouth there." Natasha then cried and told Diana D. she was scared Diana D. would "lose [them]." Diana D. later confronted appellant about "what the hell [was] going on," and appellant responded that he would not do anything "like that" to Natasha or do anything to hurt her. He said he was sorry that he may have gotten a little too close. Diana D. did not call the police out of fear that her children would be taken from her by Child Protective Services.

*Continuous Sexual Abuse from January 2, 2008, through March 22, 2009*

In Natatsha's 2009 interview at the Multi-Disciplinary Interview Center (MDIC), which was played for the jury, as well as in her testimony at the time of trial, she described what appellant had done to her.[2] She said it was "scary how long [the molestations] happened." Appellant touched her inappropriately in Damien's room (after Damien had moved out), Natasha's room, and Diana D.'s room.

Appellant would grab Natasha from behind and pull her against his body; she tried to pull away but he always trapped her in tight. Appellant would put his hand down Natasha's pants and touch her "below parts." When this happened, she was too afraid to say anything. He touched her down there "a lot of times," more than five times, and he

---

[2]    The jury also heard what Natasha told others, such as an investigating police officer (Officer Vilai Douangmala) and Diana D., about the acts of molestation.

had been doing this to her for so long it was "scary." Natasha was shown a diagram of a girl and identified what she meant by "below parts" as her vagina. Natasha also told the interviewer that appellant also would "try to stick his thing up in me, but I would try to get away, and then he'd pull me back." On a diagram, she identified that his "thing" was his penis. At least five different times, appellant pulled down Natasha's underwear and rubbed his penis against her bare bottom. Sometimes "slimy stuff" would come out. Sometimes he would also put his penis or finger in her "butthole" or between her "butt cheeks." When appellant ejaculated it disgusted Natasha so much that she nearly vomited. She said appellant tried to stick his penis in her vagina but he never succeeded. On more than three occasions, appellant forced Natasha to hold his penis with her hands. She would try to pull away but he would grab her hand and make her rub it until he ejaculated. Appellant also had Natasha "put [her] mouth on [appellant's] penis" at least "[a] couple" times and he ejaculated.

According to Natasha, appellant warned her not to tell what he was doing to her, and one time she lied about it and told her mother that she had come on to appellant. But it was "killing [her] inside," so she finally told her mother the truth.

*Final Act of Molestation—March 23, 2009*

On March 23, 2009, early in the morning, Diana D. was awakened when Natasha kicked her. There had also been some moaning sounds. When Diana D. was fully awake, she turned over and saw that appellant was in the bed on the other side of Natasha, pressed up against Natasha. Diana D. pulled back the covers and saw that Natasha's pants and underwear were pulled down exposing her buttocks. Natasha was sound asleep. Diana D. demanded that appellant "get the F out" of her room and leave the house. Appellant said he did not do anything and was just checking her to see if she was wet. Appellant asked, "[A]re you gonna call the police in?" and she said she did not know. Diana D. then woke up Natasha and told her to clean herself up with a baby wipe. Natasha then went to school. Later, Diana D. told appellant that her daughter's pants did

4.

not come down by themselves. She informed appellant that she was going to talk to Damien and the police. Appellant then left the house.

*Appellant's MDIC Police Interview*

Later that night, after appellant saw that a police car was parked in front of Diana D.'s house, he walked to a nearby police substation and asked to speak to someone about the allegations that others had made against him. Officers Jose Jauregui and Christine Gray eventually met with appellant, read him his *Miranda*[3] rights and interviewed him at length. The interview was recorded and the recording was played to the jury. The jury was also provided a transcript.

In the interview, appellant stated he believed that Diana D. was "pimping" her daughter, Natasha, into prostitution and he recently confronted Diana D. about it. He suggested the family was now accusing him of molestation because he had confronted Diana D. about pimping Natasha. Appellant said he had observed Natasha make sexual gestures to grown men. He added that when she played with Barbie dolls, she would say things like she wanted "a big thing" and had one doll say to another one, "suck it[,] suck it." He mentioned, as evidence of Diana D.'s mindset toward Natasha, that Diana D. "played with" appellant's penis while Natasha was present.[4] When appellant directly challenged Diana D. about pimping Natasha, she denied it and said he was crazy.

The police then asked appellant about his own conduct concerning Natasha. Appellant claimed that Natasha was "touchy feely," aggressively "fast" and would sit in his lap and grab him in the crotch. (Frequently, he would wake up in bed and she would be there holding his penis. He admitted that he did not stop her the way he should have

---

**3**      *Miranda v. Arizona* (1966) 384 U.S. 436.

**4**      Diana D. admitted she "hand jobbed" appellant once. She did not think Natasha was present at the time, but she could not remember. At trial, appellant testified that Natasha was present but "sleeping" at the time this occurred.

5.

when she rubbed his penis and, although he ejaculated, he was not "fully aware." Speaking of oral copulation, he said Natasha may have done that to him also while he was sleeping. He admitted that his penis had been in her mouth, but "not purposely" since he was sleeping. He said that Natasha orally copulated him at least twice, both times in Diana D.'s bed, with Diana D. present. He later denied that the acts of oral copulation happened over 20 times, stressing it was fewer than five times and it occurred in Natasha's room also. Appellant insisted he was not participating intentionally in these acts, but rather Natasha was doing these things to him and he was always a victim.

B.      Defense Case

*Appellant's Trial Testimony*

Appellant testified at trial, making similar claims to the ones he told the police in his MDIC interview. He said he knew for a fact that prostitution was going on because of various things he saw and heard. He testified of an incident at the laundromat. While at the laundromat, Diana D. asked appellant to go buy a beer at a nearby store. Appellant thought that was odd and he suspected that Diana D. was trying to get him out of the way. When appellant returned, he saw Natasha on her knees in the Laundromat office. Natasha got up quickly like she was hiding. A man also exited the office. Natasha went outside and started throwing up. Appellant said he later overhead a conversation between Diana D. and Damien in which Damien asked, "well, how fast—how fast did she do it?"

Appellant testified that he saw Natasha make sexual gestures to men, including a gesture like putting a penis in her mouth. He saw Natasha acting like she was giving out her phone number to men. Appellant also noted that Natasha's vocabulary had changed, and she started to say "pimp" this and "ho" that, and he also observed Natasha acting out sexually with her dolls. Appellant overheard Diana D. tell one of M.'s boyfriends that Natasha was a "whore."

Appellant testified that more than once, he walked into Diana D.'s room and found Diana D. and Natasha in "compromising positions." He claimed that M. was also

6.

involved in teaching Natasha things of a sexual nature. Allegedly, M. would talk about sex, including oral sex, in front of Natasha. M. would often have boyfriends over. On those occasions, Natasha would sit in the boys' laps and grab them. He testified that one time, M.'s bedroom door was locked and he pounded on the door because he knew something was happening, and when the door was opened, there was Natasha on her knees with her face near one boy's crotch.

Appellant said Diana D. tried to get appellant to have sex with her (Diana D.). Appellant was not interested and told Diana D. he could not get an erection. One day Diana D. just grabbed him and said, "well, let me see." Natasha was asleep in the room at the time.

Appellant testified that on March 23, 2009, he had a serious argument with Diana D. as he confronted her again about prostituting Natasha. Appellant was so angry with Diana D. he told her that "somebody should blow her head off." Appellant told Diana D. at that time that he knew Natasha was "prostituting orally," but because of the strange way Natasha was walking he thought Diana D. now "had her doing vaginal prostituting." Appellant rubbed on Natasha's vagina to find out if he could "smell sex" on her. It was after this confrontation that the accusations of molestation were made against him.

As to his own conduct toward Natasha, appellant testified that Natasha was "touchy feely" and "sexually aggressive." She would grab his crotch over his clothes. Sometimes he would wake up in bed and find her holding his penis in her hand or rubbing him. He did not deny what he had told the police previously about occurrences of oral copulation, but indicated it was while he was sleeping. Appellant said he did not try to stop the sexual behavior because he was trying to bust Diana D. for what she was doing. He reiterated that Natasha was always the one doing it to him, coming on to him, and he was the victim.

7.

*Other Evidence*

Ryan Carter, a crime scene technician for the City of Fresno, testified that he tested the bedrooms and bedding in Diana D.'s home for physiological evidence such as seminal fluid, blood, and urine. He used an ultraviolet light source as the means of detecting such physiological substances. He found none in the bedrooms at Diana D.'s home.

Officer Thaoseng Xiong of the Fresno Police Department received a call that there was an incident of possible physical or sexual abuse of Natasha at a local library. A woman, Maria Ortiz, had observed the incident between appellant and Natasha. She saw Natasha bending over trying to get her bicycle and appellant was standing right behind her while she bent over. The situation appeared suspicious to Ms. Ortiz. Officer Xiong, of the child abuse unit, was sent to Natasha's school to investigate the report of possible abuse. After speaking with Natasha, he concluded there was no evidence that abuse had occurred at the library. Natasha told Officer Xiong that she liked appellant very much and he had never abused her.

Natasha acting out sex acts with her dolls.

C.  Verdict and Sentence

On July 20, 2011, the jury reached a verdict. It found appellant guilty as charged on all three counts. On August 29, 2001, appellant was sentenced to a total prison term of 20 years. Appellant timely appealed.

**DISCUSSION**

I.  **Exclusion of Evidence**

Appellant's first argument is that his conviction must be reversed because the trial court excluded certain testimony regarding a lollipop incident that occurred between Natasha and M. We disagree.

We begin with a brief synopsis of the evidence and the basis for the trial court's ruling. Appellant's trial counsel asked Natasha's foster mother, L.B., whether she

8.

recalled "indicating to [a] Mr. Rubio that [M.] was playing with a lollipop at some point with Natasha[.]" Ms. B. replied in the affirmative, but clarified that she did not personally witness the lollipop incident in question; rather, Natasha had told her about it. Counsel for the prosecution then objected that the testimony was *hearsay*. The trial court asked appellant's counsel if there was any applicable hearsay exception, and counsel replied, "I'm wondering if it's [a] prior inconsistent statement, but I can't recall exactly what her statements were." At that point, the trial court held a conference with counsel off the record.

While the jury was outside the courtroom, the trial court placed onto the record the content of the discussions that occurred off-the-record, as follows:

> "THE COURT: I want to protect the record for your sake, [defense counsel]. There was a discussion we had at side bar during the cross-examination of Ms. [B.] in which you sought to ask her about an incident relating to a lollipop, I guess is about the way I'll describe it. And you shared a statement in writing as to what you understood that Ms. [B.] had said. And I concluded that it was not within the prior inconsistent statement exception to the hearsay rule. So if you want to make a record—
>
> "[DEFENSE COUNSEL]: If I could read the statement that I have.
>
> "THE COURT: Okay.
>
> "[DEFENSE COUNSEL]: [Ms. B.] remembers having a conversation with Carter, who is a social worker incidentally, where she mentioned [M.] using a lollipop to try to show Natasha how to perform oral sex. She said it was not in the reports.
>
> "THE COURT: Okay. And—okay. I guess having had that clarification now, it seems to me there's probably more objections to be said as to hearsay. It appeared to the court that you were going to attempt to have this witness, Ms. [B.], testify as to what Natasha had to say about that incident, right?
>
> "[DEFENSE COUNSEL]: Um, I don't think Natasha was really going to say that. I think—
>
> "THE COURT: How would this not be completely hearsay?

9.

"[DEFENSE COUNSEL]: I think it's what she saw.

"THE COURT: What who saw?

"[DEFENSE COUNSEL]: I think [Ms. B.] seems to have seen something like this or had a conversation with Carter who is the social worker.

"THE COURT: I'll let you go back and look at the court reporter's record here, sir. But there was nothing about her response that suggested she was—had seen anything. I believe she started to say Natasha told me, which is where [the prosecutor] objected on the grounds of hearsay. And I asked you if there was some exception[.] You suggested it might be a prior inconsistent statement. And because Natasha had never been asked about the subject of conversations with [M.] at any time after she left the home with CPS, it was the court's view that there was no prior inconsistent statement about lollipops at all. And so did you have some theory that you want to make a record of that somehow Natasha talked about [M.] and lollipops in her testimony[?]

"[DEFENSE COUNSEL]: No, your honor.

"THE COURT: Okay. Like I said, I don't believe that there's any evidence to suggest that [Ms. B.] saw anything about that."

Appellant argues the trial court erred in excluding Ms. B.'s testimony about what Natasha told her concerning the lollipop incident. He claims that the testimony was admissible, not so much for its truth, but as circumstantial evidence of Natasha's state of mind. (See, e.g., *People v. Cox* (2003) 30 Cal.4th 916, 962 [exception to hearsay rule for circumstantial evidence of state of mind]; *People v. Turner* (1994) 8 Cal.4th 137, 189 [out-of-court statement may be admitted for a nonhearsay purpose].) As explained in *People v. Ortiz* (1995) 38 Cal.App.4th 377: "[A] statement which does not directly declare a mental state, but is merely circumstantial evidence of that state of mind, is not hearsay. It is not received for the truth of the matter stated, but rather whether the statement is true or not, the fact such statement was made is relevant to a determination of the declarant's state of mind." (*Id*. at p. 389.) According to appellant, the evidence was relevant to show that Natasha was in a "sexualized" state of mind that originated

with and was taught by M.—not appellant—which fact would arguably support his contention that Natasha initiated the oral sex and he was the victim. Appellant's appeal further stated: "Natasha's statements were relevant to explain her state of mind and to explain her acts or conduct. Having been instructed on how to perform oral sex by her sister … explained Natasha's performing oral sex on appellant as he slept."

The fatal flaw in appellant's argument on appeal is that he never presented this theory of admissibility below. In the trial court, it was not even remotely suggested that the evidence was admissible on the ground that it tended to circumstantially show Natasha's state of mind. Rather, the evidence was being offered for the truth of the matter, and when the trial court asked appellant's counsel to specify a hearsay exception, the only basis offered for potential admissibility was that the testimony might be a prior inconsistent statement—which the trial court properly rejected. The proponent of hearsay has the burden to alert the trial court to the exception or ground for admissibility that is being relied upon. (*People v. Livaditis* (1992) 2 Cal.4th 759, 778.) Here, since appellant did not present the "state of mind" theory of admissibility in the trial court, that issue is not cognizable on appeal. (*People v. Ervine* (2009) 47 Cal.4th 745, 779; *People v. Smith* (2003) 30 Cal.4th 581, 629-630; Evid. Code, § 354.) Accordingly, appellant's claim of error is forfeited.

Even if appellant had preserved the issue for appeal, no reversible error is apparent. A trial court's rulings on the admissibility of evidence are reviewed under the abuse of discretion standard. (*People v. Alvarez* (1996) 14 Cal.4th 155, 201.) "[A]n appellate court applies the abuse of discretion standard of review to any ruling by a trial court on the admissibility of evidence, including one that turns on the hearsay nature of the evidence in question [citations]." (*People v. Waidla* (2000) 22 Cal.4th 690, 725.) Here, there were no foundational facts in the trial court below to indicate *when* the lollipop incident may have occurred. Appellant concedes in his reply brief that if the lollipop incident occurred after appellant's arrest, it would have been *irrelevant*. "An

11.

appellate court may not reverse a judgment because of the erroneous exclusion of evidence unless the 'substance, purpose, and relevance of the excluded evidence was made known to the court by the questions asked, an offer of proof, or by *any other means*.' [Citations.]" (*People v. Livaditis*, *supra*, 2 Cal.4th at p. 778, citing Evid. Code, § 354, subd. (a).) Since there was no evidence regarding when the lollipop incident may have occurred, key foundational facts of admissibility (relevance) were lacking. Accordingly, even if the issue had been adequately preserved for appeal, no clear abuse of discretion is shown.

Finally, even if the trial court erred in excluding the evidence, the error was not prejudicial. The evidence that appellant perpetrated multiple acts of sexual molestation against Natasha was substantial, detailed and virtually overwhelming, including the testimony of Diana D. (as to counts 2 and 3) and the 2009 MDIC interview of Natasha (as to count 1). On this record, even if evidence of the lollipop incident had been admitted at trial, there is no reasonable possibility that the jury would have returned a more favorable verdict (*People v. Watson* (1956) 46 Cal.2d 818, 836), or been persuaded by appellant's theory that Natasha, a 10-year-old girl, repeatedly sexually molested appellant and that he, a 39-year-old man, was merely a nonparticipating, passive victim.[5]

## II. Jury Instruction

Appellant contends the trial court erred in instructing the jury with a modified version of CALCRIM No. 207 because, allegedly, the instruction did not adequately clarify that the time frame and acts in counts 2 and 3 had to be distinct from those in count 1. The People argue that the issue has been forfeited under the doctrine of invited

---

[5] To the extent that appellant's purported defense bordered on "consent" or "willingness" on the part of the victim, we note there is no such defense to the crimes appellant was charged with. (*People v. Soto* (2011) 51 Cal.4th 229, 238, 248.)

error, but that in any event the instruction was adequate. The People are correct on both points.

Preliminarily, we find the People are correct that appellant forfeited this issue since he not only failed to object or to request a clarified instruction, but also by affirmatively approving the instruction when the trial court suggested the particular wording. "Because defendant *expressly agreed* to this instruction, he is barred from challenging it on appeal under the doctrine of invited error." (*People v. Davis* (2005) 36 Cal.4th 510, 539.) Although, in this context, application of the doctrine of invited error requires there be some tactical purpose apparent in appellant's agreement or acquiescence in the particular jury instruction (*People v. Tate* (2010) 49 Cal.4th 635, 695, fn. 32), here that tactical purpose is evident: appellant sought to ensure the instruction more fully and specifically elaborated the segregation of the time periods and acts of the three distinct counts. Additionally, where (as here) the instruction was legally adequate but potentially could have been drafted with greater specificity, "a defendant's failure to request a clarification instruction forfeits that claim on appeal." (*People v. Young* (2005) 34 Cal.4th 1149, 1202; see also *People v. Samaniego* (2009) 172 Cal.App.4th 1148, 1163.) For all of these reasons, appellant forfeited this issue.

In any event, the instruction was adequate in stating the applicable law and would not have misled the jury. If a jury instruction is arguably ambiguous, "'we inquire whether there is a reasonable likelihood that the jury misunderstood and misapplied the instruction.' [Citations.] … The reviewing court also must consider the arguments of counsel in assessing the probable impact of the instruction on the jury." (*People v. Young*, *supra,* 34 Cal.4th at p. 1202.) "A defendant challenging an instruction as being subject to erroneous interpretation by the jury must demonstrate a reasonable likelihood that the jury understood the instruction in the way asserted by the defendant." (*People v. Cross* (2008) 45 Cal.4th 58, 67-68.) "'"Jurors are presumed to be intelligent, capable of

13.

understanding instructions and applying them to the facts of the case.'" [Citations.]" (*People v. Carey* (2007) 41 Cal.4th 109, 130.)

Here, the trial court instructed the jury using a modified version of CALCRIM No. 207, as follows: "It is alleged in Counts Two and Three that the crimes occurred on or about January 1, 2008 and March 23, 2009, respectively. The People are not required to prove that the crimes took place exactly on those days but only that they happened reasonably close to those days. *However, the lewd acts alleged in Counts Two and Three are not included in the period from January 2, 2008 to March 21, 2009 alleged in Count One*."[6] (Italics added.) The modified instruction was the result of discussions between counsel and the trial court, and the wording was substantially the same as an instruction submitted earlier by appellant's counsel. The precise wording of the modified instruction was suggested by the trial court and expressly agreed to by both counsel. Appellant's counsel stated, "[the] Defense is satisfied."

The reason for the modified instruction regarding the acts and timing of the three counts was to ensure compliance with the holding of *People v. Johnson* (2002) 28 Cal.4th 240 (*Johnson*). In that case, the Supreme Court explained that certain limitations were imposed by the Legislature under section 288.5 relating to the crime of continuous sexual abuse of a child: "In a prosecution under the statute, the trier of fact need unanimously agree only that the requisite number of specified sexual acts occurred, not which acts constituted the requisite number. [Citation.] The statute, however, imposes certain limits on the prosecution's power to charge both continuous sexual abuse and specific sexual offenses in the same proceeding.… '[N]o other felony sex offense involving the same victim may be charged in the same proceeding with a charge under this section unless the

---

[6]     The last sentence (the italicized wording) was added to what would otherwise be a standard CALCRIM No. 207 instruction.

other charged offense occurred outside the time period charged under this section or the other offense is charged in the alternative.' [Citation.]" (*Id*. at p. 243.)

The Supreme Court concluded its discussion of section 288.5 by emphasizing that "[p]rosecutors in sexual abuse cases possess a variety of means to seek convictions and severe punishments in cases involving sexual offenses against vulnerable young victims." (*Johnson*, *supra*, 28 Cal.4th at p. 248.) For example, prosecutors may "charge continuous sexual abuse and discrete sexual offenses outside the period of the alleged continuous abuse [citation] …." (*Ibid*.) They also may charge a defendant with discrete sexual offenses and continuous sexual abuse within the same time period, as long as the charges are in the alternative. (*Ibid*.) However, because section 288.5 "clearly mandates the charging of continuous sexual abuse and specific sexual offenses, pertaining to the same victim *over the same period of time*, *only in the alternative*, they may not obtain multiple convictions in the latter circumstance." (*Johnson*, *supra*, at p. 248, italics added.) If multiple convictions are obtained in violation of section 288.5—that is, if the specific sexual offenses occurred within the same time period as the continuous sexual abuse—"either the continuous abuse conviction or the convictions on the specific offenses must be vacated." (*Johnson*, *supra*, at p. 245; see also *People v. Bautista* (2005) 129 Cal.App.4th 1431, 1436.)

Appellant was charged in count 1 of the second amended information with continuous sexual abuse from January 2, 2008 through March 21, 2009. Count 2 alleged a lewd act on January 1, 2008; and count 3 alleged a lewd act on March 23, 2009. Thus, the allegations did not overlap the time period of the continuous sexual abuse with the specific offenses. Likewise, the jury instruction specifically informed the jury that the lewd acts alleged in counts 2 and 3 "[were] not included in the period from January 2, 2008 to March 21, 2009 alleged in Count One." Because the instruction made clear that counts 2 and 3 were outside the time period applicable to count 1, it appears that the jury

would have reasonably understood how to segregate the counts and time periods in accordance with the principles set forth in *Johnson*, *supra*, 28 Cal.4th 240.

Moreover, in closing argument, the prosecutor further clarified the matter. In discussing count 1, he stated that while appellant "certainly" committed more than three sexual acts, "we're focusing just on acts separated from Counts Two and Three, which are the January 1st, 2008, event and the March 23, 2009 [event]." In similar fashion, appellant's trial counsel argued in closing argument: "[L]et's be very careful with these charges. Three separate counts. One happened January 1st, 2008; one happened March 23, 2009; and there's this middle count that kind of encompasses continuing sexual abuse. The March date and the January date are not part of the continuing sexual abuse. They are separate." Finally, the parties were careful to include the specific dates applicable to each count on the verdict forms, and the prosecutor brought the forms to the jury's attention, saying "[w]e have the dates down there so there will be no confusion."

We conclude the trial court's instruction was reasonable clear and adequate to ensure that the jury would comply with the principles of *Johnson*, *supra*, 28 Cal.4th 240. Additionally, even if there was any potential ambiguity, the closing arguments of counsel and the verdict forms plainly rectified it. Appellant has failed to show any instructional error.

## **DISPOSITION**

The judgment is affirmed.

_____
Kane, J.

WE CONCUR:

_____
Wiseman, Acting P.J.

_____
Cornell, J.

17.